In re OLD NAPLES SECURITIES, INC., Debtor.

Theodore H. Focht, as Trustee, and Securities Investor Protection Corp., Appellants,

v.

Tessie C. Athens, Stephen and Linda Compos, Charles and Holly Conroy, Patricia Fotopoulos, John and Margaret Heist, Theodore and Katina Kourpas, David and Anita Linden, and Peter and Deborah Loupos, Appellees.

Dean P. McDermott, and Compos–McDermott Securities, Inc., Appellants,

v.

Theodore H. Focht, as Trustee, and Securities Investor Protection Corp., Appellees.

Theodore H. Focht, as Trustee, and Securities Investor Protection Corp., Appellants,

v.

Kathleen Kovacs, Appellee.

Nos. 2:00–cv–181–FTM–29D, 2:00–cv–182–FTM–29D, 2:00–cv–327–FTM–29D.

United States District Court, M.D. Florida, Fort Myers Division.

Sept. 30, 2002.

---

**20.** *See* note 10 *supra.*

**21.** *See* 28 U.S.C.A. § 157(e) (West 2004).

Mark J. Wolfson, Lori Virginia Vaughan, Foley & Lardner, Tampa, FL, Kenneth J. Caputo, Securities Investor Protection Corporation, Washington, DC, for Appellants.

Donald A. Workman, Foley & Lardner, Tampa, FL, Stephen P. Harbeck, Securities Investor Protection Corporation, Washington, DC, Lee S. Haramis, Jason B. Burnett, Becker & Poliakoff, P.A., Jacksonville, FL, for Appellants and Appellees.

### MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court[1] on consolidated appeals from three orders of the United States Bankruptcy Court for the Middle District of Florida.

[1]. These appeals were originally assigned to the Hon. Patricia C. Fawsett. They were subsequently reassigned to the Hon. John E. Steele. Pursuant to an inter-circuit assignment under 28 U.S.C. § 294(d), the undersigned is now the Judge of record in this case.

## BACKGROUND

This case arises out of the insolvency of Old Naples Securities, Inc. ("ONSI"). ONSI was a securities broker-dealer with offices in Naples, Florida and Bethlehem and Wyomissing, Pennsylvania. The President and sole shareholder of ONSI, James Zimmerman, operated out of the Naples office. The Bethlehem branch office was owned and operated by Stephen Compos and Dean McDermott, who are brothers-in-law and who are also both claimants in these proceedings. Together, Compos and McDermott also owned Compos–McDermott Securities, Inc. ("CMSI"), an insurance agency and another claimant herein. The Wyomissing branch was operated by Daniel Shaffer.

ONSI was never profitable. To sustain operations, Zimmerman continually borrowed money. Eventually, when the substantial loans became due, he hatched a Ponzi scheme. He convinced Compos, McDermott, and Shaffer to persuade their clients to send him money for the alleged purchase of bonds. The clients were promised a risk-free investment with a 30– to 45–day return of the principal plus a guaranteed percentage return on the principal, usually 7%. The branch office operators earned an additional 9% commission on each "investment." Compos, McDermott, CMSI, and Shaffer also provided their own money to Zimmerman, with the same promise that they would receive a risk-free return on their principal of 16% (7% plus the 9% commission) within 45 days.[2]

In reality, Zimmerman was not buying any bonds but was using the funds from

[2]. The Trustee points out that McDermott, Compos, and CMSI were thus all promised an annualized rate of return of 128% to 192%.

one group of clients to pay the principal and return of the other group of clients. The scheme eventually collapsed in August 1996, after McDermott confronted Zimmerman about his failure to pay some of the clients and Zimmerman confessed the scheme. McDermott and his attorney then notified the FBI.

On August 28, 1996, the District Court entered an order finding that the customers of ONSI were in need of the protections of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and appointing Theodore H. Focht as Trustee. The Bankruptcy Court then established a procedure for filing and resolving customer claims. Under the relevant provisions of SIPA, only "customers" of ONSI are entitled to SIPA's protections and may recover under SIPA's reimbursement provisions. "Customer" is defined in pertinent part as "any person who has deposited cash with [ONSI] for the purpose of purchasing securities." *Id.* § 78*lll*(2). The Trustee eventually denied many of the claims, finding that the claimants were not "customers" of ONSI because the transactions were loans, not the purchase of securities as required by SIPA § 78*lll*(2) and (14). Four groups of claimants appealed the Trustee's decision to the Bankruptcy Court, and three of those cases are now before this Court.

The claims of one group of claimants have been completely disposed of. This group, referred to as the Heebner and Brown claimants, was initially denied customer status by the Trustee. The Bankruptcy Court reversed the decision of the Trustee, finding that the three claimants were customers of ONSI and were entitled to the protections of SIPA. The District Court and Eleventh Circuit affirmed. *In*

*re Old Naples Sec., Inc.*, 230 B.R. 441 (M.D.Fla.1999); *In re Old Naples Sec., Inc.*, 223 F.3d 1296 (11th Cir.2000). The parties disagree about the import of that case to the instant appeals.

The Bankruptcy Court similarly overturned the Trustee's decision with respect to another group of claimants (the "Athens claimants"). This group is made up of Tessie Athens, Charles and Holly Conroy, Patricia Fotopoulos, John and Margaret Heist, Theodore and Katina Kourpas, David and Anita Linden, Peter and Debra Loupos, and Stephen and Linda Compos. As mentioned above, Stephen Compos is one of the owners of CMSI and, together with McDermott, operated ONSI's branch office in Bethlehem, PA. The Trustee[3] has appealed the Bankruptcy Court's decision on customer status only as to Compos. The Trustee also contends that the Bankruptcy Court erred in determining the payment amounts due to the other Athens claimants.

In a separate opinion, the Bankruptcy Court held that another claimant, Kathleen Kovacs, was a customer of ONSI. The Trustee appeals that order. The briefing for the Kovacs and Athens appeals has been consolidated.

Finally, the Bankruptcy Court denied customer status for the last group of claimants, made up of McDermott and CMSI. They have appealed that decision, and the briefing on that appeal is separate from the Athens/Kovacs briefing.

## DISCUSSION

### A. Standard of Review

■ One of the key issues to be decided in these cases is whether Compos, McDermott, and CMSI are entitled to customer

---

**3.** The Trustee and the Securities Investor Protection Corporation ("SIPC") are joint appellants/appellees in these consolidated matters.

The Court will refer to them collectively as the "Trustee."

status under SIPA. There is no dispute that this issue is a question of law that receives de novo review in this Court. *Sec. Investor Prot. Corp. v. Wise (In re Stalvey & Assocs.)*, 750 F.2d 464, 468 (5th Cir.1985). The Bankruptcy Court's factual findings, however, are reviewed only for clear error. *Green Tree Acceptance, Inc. v. Calvert (In re Calvert)*, 907 F.2d 1069, 1071 (11th Cir.1990).

## B. McDermott and CMSI's Appeal

McDermott and CMSI contend that the Bankruptcy Court erred in determining that they were not "customers" of ONSI and thus are not entitled to the protections of SIPA. According to McDermott and CMSI, the Bankruptcy Court's findings as to the other claimants mandate a finding that they, too, were customers of ONSI. Further, McDermott argues that the Bankruptcy Court erred in applying the doctrine of judicial estoppel to preclude McDermott from contending in this proceeding that the money he provided to ONSI was anything other than a loan. The Trustee opposes the appeal. He asserts as an alternative ground for affirmance that the Bankruptcy Court could have determined as a matter of law that McDermott was not entitled to the protections of SIPA because the SEC found that McDermott violated the securities laws with respect to the transactions at issue.

### 1. *Law of the case*

■ McDermott and CMSI's claim that because the Bankruptcy Court found that the other claimants were customers of ONSI necessarily means that McDermott and CMSI were customers as well is without merit. There are distinct differences between the other claimants (aside from Compos, whose claim will be discussed in more detail below) and McDermott and CMSI. First, McDermott and CMSI are not the "unsophisticated participant[s] in securities transactions" that SIPA was designed to protect. *In re Old Naples Sec.*, 223 F.3d at 1303 (quoting *In re Gibralco, Inc.*, 53 B.R. 324, 329 (Bankr.C.D.Cal. 1985)). McDermott is an experienced securities broker and has a doctorate degree in finance with a concentration in municipal finance. McDermott's high level of knowledge about securities transactions in general and about ONSI in particular sets him apart from the other claimants and itself justifies the differential treatment he received from the Bankruptcy Court.

■ Further, as the Bankruptcy Court found, McDermott (and through McDermott, CMSI[4]) has failed to show that he entrusted money to ONSI "for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2). "When a claimant entrusts cash with a brokerage, and the broker misappropriates the money, courts must determine whether the intended investment *as understood by the claimant* would have been in a 'security' as defined by SIPA." *In re Old Naples*, 223 F.3d at 1304 (emphasis added).

In this situation it is clear that the transactions as understood by McDermott were not purchases of securities. First, McDermott testified that he understood the transactions as loans, or as payments to escrow to allow Zimmerman to purchase the unspecified bonds. Whether or not McDermott should be judicially estopped from disavowing this testimony, the Bankruptcy Court was within its discretion to consider this testimony when determining what McDermott knew or did not know

---

4. The Bankruptcy Court conectly found that the majority of CMSI's claim was for unpaid commissions, for which CMSI is not entitled to customer status. (*See* Feb. 9, 2000, Order at 11.)

about the transactions in question. McDermott's previous testimony, even in light of his later testimony to the contrary, gives ample support to the Bankruptcy Court's conclusions regarding his status as a customer of ONSI.

■ Moreover, it stretches credulity that McDermott would have believed that these supposedly "risk-free" transactions with extraordinary guaranteed rates of return were in fact legitimate transactions in securities. Although bonds are certainly one of the safest securities investments, the Court is aware of no bonds that pay the astronomical rates of return that were promised to the claimants in this case. An unsophisticated investor might be forgiven for believing that the transactions actually involved bonds. McDermott must have known differently, and he cannot now claim that he, too, was duped. As the Eleventh Circuit noted in the case involving the Heebner and Brown claimants, "willful ignorance on the claimant's part in the face of clear indications that an investment scheme is suspect may preclude a finding that the claimant intended to purchase 'securities' covered by the Act." *Id.* at 1305. McDermott's profession of ignorance in this case is tantamount to willful ignorance. His claim and the claim of CMSI were properly disallowed by the Bankruptcy Court.

### 2. *Judicial estoppel*

■ Alternatively, the Bankruptcy Court did not err in applying the doctrine of judicial estoppel to preclude McDermott from claiming that the transactions were not loans. "Judicial estoppel is applied to the calculated assertion of divergent sworn positions." *Am. Nat'l Bank of Jacksonville v. Fed. Deposit Ins. Corp.,* 710 F.2d 1528, 1536 (11th Cir.1983). The policy underlying judicial estoppel "is directed against those who would attempt to manip-

ulate the court system" through asserting divergent positions in judicial proceedings. *Johnson Serv. Co. v. Transam. Ins. Co.,* 485 F.2d 164, 174 (5th Cir.1973). This Court should review the Bankruptcy Court's application of the doctrine simply to determine whether that application is consistent with the policy underlying the doctrine. *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1261 (11th Cir.1988), *abrogated on other grounds, Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

McDermott presses a different standard for the application of judicial estoppel, citing cases from the First Circuit Court of Appeals as "informative" on the subject, and as requiring a more searching inquiry than the cases cited above. He offers no reason why this Court should disregard on-point precedent from the Eleventh Circuit in favor of non-binding precedent from another Court of Appeals. Moreover, no court in this Circuit has followed the reasoning of the cases cited by McDermott, nor has the Eleventh Circuit retreated from the description of the doctrine of judicial estoppel in *American National Bank of Jacksonville.* Indeed, the court very recently relied on that description. *Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1285 (11th Cir.2002). This Court is bound to follow Eleventh Circuit precedent and will do so here.

■ In his testimony before the SEC, McDermott repeatedly refers to the transactions at issue as "loans." He now contends that such terminology was a shorthand reference chosen by the SEC attorneys and McDermott's attorney to refer to the transactions. McDermott misrepresents the record. In fact, the term "loan" was a shorthand chosen by McDermott and his attorney because, as the attorney and McDermott both insisted, loans were how McDermott under-

stood the transactions. (*See* Focht Ex. 46 [McDermott dep.] at 24 (McDermott's attorney: "... for these purposes we can call them loans because this is [McDermott's] understanding of what was occurring"); 24–25 (McDermott: "[Loan] is how they were described to me"); 28 (McDermott's attorney: "[McDermott] believes these were loans and Mr. McDermott will testify that he always believed these were loans").)

Given this evidence and McDermott's attempt at the evidentiary hearing before the Bankruptcy Court to assert a completely divergent position, the Bankruptcy Court was well within its discretion to apply judicial estoppel and preclude McDermott from claiming that he understood the transactions as anything other than loans. It is in precisely this situation that courts must apply the doctrine of judicial estoppel. Before the SEC, McDermott thought that characterizing the transactions as loans would help his position and lead the SEC to conclude that it had no jurisdiction. Before the Bankruptcy Court, however, he realized that characterizing the transactions as loans would preclude any recovery under SIPA, so he changed his story. The policy behind the doctrine of judicial estoppel requires the court to step in in such a situation and protect the integrity of its proceedings. The Court affirms the Bankruptcy Court's determination on judicial estoppel.

### 3. *The Packer, Wilbur doctrine*

The Trustee presses an alternative ground on which to affirm the Bankruptcy Court. He contends that because the SEC found that McDermott and Compos violated securities laws with respect to the transactions at issue, they are not entitled to the protections of SIPA. *See SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 984–

85 (2d Cir.1974) (finding that "one who engages in a fraudulent transaction cannot reap the benefits of the Act's intended protection"). McDermott asserts that the doctrine espoused in *Packer, Wilbur* is limited to those who engage in a willful and/or knowing violation of the securities laws. According to McDermott, the SEC at most found that McDermott and Compos failed to conduct a sufficient investigation and ignored "red flags" that should have alerted them to the fraudulent nature of the transactions.

The holding of *Packer, Wilbur* and its progeny are not as restricted as McDermott argues. In March of this year, the Bankruptcy Court for the Southern District of New York specifically found that the *Packer, Wilbur* doctrine was not limited to cases of knowing or active participation in the securities law violations. *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 558–59 (Bankr.S.D.N.Y.2002). The court held that a claimant could be denied customer status under SIPA for merely "clos[ing] his eyes" to the wrongful nature of the transactions or for even less egregious behavior. *Id.* at 559. Under this reading of the *Packer, Wilbur* doctrine, McDermott and Compos are undoubtedly barred from obtaining customer status in this matter.

However, as McDermott points out, neither the Eleventh Circuit nor any Florida court has adopted, applied, or even cited the *Packer, Wilbur* doctrine. Thus, it is not clear that the doctrine applies in this case. The Court is reluctant to impose a bar on SIPA recovery based entirely on cases which are not binding precedent. Because the Court has already determined that other factors preclude McDermott and CMSI from obtaining customer status in this matter, it is not necessary to conclusively determine the applicability of the *Packer, Wilbur* doctrine to this case and in

this court. The Court believes that the policies behind the *Packer, Wilbur* doctrine are sound, namely precluding customer status to those who are claimants only by virtue of their violations of the securities laws. However, the Court will leave to another day the question of whether the doctrine should be the law in this District.

### C. Kovacs and the Athens Claimants

The Trustee does not take issue with the Bankruptcy Court's findings that Ms. Kovacs and the majority of the Athens claimants were customers of ONSI and are entitled to the protections of SIPA. He asserts, however, that the Bankruptcy Court erred in finding that Stephen Compos was a customer of ONSI. He also argues that the Bankruptcy Court's calculation of the amounts due the claimants was erroneous because it did not offset any amounts that the claimants received as interest or return of principal from ONSI or CMSI.[5]

#### 1. *Compos' claim*

The only ground on which the Trustee relies for his argument that Compos' claim should be denied is the *Packer, Wilbur* doctrine, discussed in detail above. As noted, however, that doctrine has not been adopted by the courts of this District or of this Circuit. The Court will not apply

*Packer, Wilbur* to preclude Compos from obtaining customer status.

■ However, as with McDermott, there are other grounds on which to deny Compos customer status in this matter. Although Compos does not have a graduate degree in finance, he is a registered securities broker with fairly significant experience in bonds. (*See* Focht Ex. 57 [Compos Dep.] at 14.) Thus, like McDermott, Compos knew or should have known that the extraordinarily high rates of return promised by Zimmerman could not have arisen from legitimate bond transactions. Indeed, Compos testified that he did not do any bond work at CMSI after 1992 because the rates were so low. (*Id.* at 17.) The same standard applied above to McDermott should apply to Compos: "willful ignorance on the claimant's part in the face of clear indications that an investment scheme is suspect may preclude a finding that the claimant intended to purchase 'securities' covered by the Act." *In re Old Naples*, 223 F.3d at 1305. Compos' willful ignorance prevents him from obtaining the protections of SIPA.[6] The Bankruptcy Court should have disallowed his claim.

#### 2. *Amounts due to claimants*

■ The dispute over what amount is due to the remaining claimants arises, in part, because of the inconsistent recoveries allowed by the Bankruptcy Court in this

---

**5.** With respect to Ms. Kovacs' claim, the Bankruptcy Court applied the offset requested by the Trustee. Thus, it is not clear what portion of the Bankruptcy Court's decision regarding Ms. Kovacs the Trustee is appealing. Ms. Kovacs did not take a cross-appeal, although her counsel urges the Court to reverse the offset applied against her claim "for fairness and consistency's sake." (Appellees' Opp'n Mem. at 25.) As the Trustee notes, however, failure to take an appeal deprives this Court of jurisdiction over any claim Ms. Kovacs might have regarding the offset.

**6.** Compos urges the Court to allow his wife's claim, contending that she at least is an innocent investor. The record shows, however, that Mrs. Compos played absolutely no role in these transactions other than as joint holder of the account from which the money was drawn. Thus, her claim rises and falls with her husband's claim. *See SEC v. Provident Sec., Inc.*, 452 F.Supp. 477, 478 n. 3 (S.D.N.Y. 1978).

case. In the Heebner and Brown case, the court allowed the Trustee to subtract from the final recovery any principal amount and/or interest each claimant received from ONSI or CMSI. Similarly, in sustaining Ms. Kovacs' objections to the Trustee's denial of her claim, the Bankruptcy Court determined that the amount due Ms. Kovacs would be set off by any amounts she received from ONSI or CMSI. However, in granting the Athens claimants' Motion to Alter or Amend the Judgment, the Bankruptcy Court simply allowed the claims and did not address whether those claims should be offset by any amounts the claimants received from ONSI or CMSI.

SIPA provides that a customer of a defunct brokerage house is entitled to receive his or her "net equity" from the SIPA fund, up to defined statutory limits. 15 U.S.C. § 78fff–2(b). The relevant statutory limit in this case is $100,000 per claimant. *Id.* § 78fff–3(a). To the extent a customer's claim exceeds the statutory limit, he or she may participate in the general bankruptcy estate as an unsecured creditor. *Id.* § 78fff–2(c). The Trustee contends that the Bankruptcy Court's failure to offset the claims was erroneous because net equity does not include interest or other payments received. According to the Trustee, participants in a Ponzi scheme such as that involved here are entitled only to receive their net loss, or the amount invested less any payments received.

In support of his argument, the Trustee cites *In re C.J. Wright & Co.*, 162 B.R. 597 (Bankr.M.D.Fla.1993). In that case, Bankruptcy Judge Proctor found that claimants, who believed they were investing in certificates of deposit but were in fact victims of a Ponzi scheme not unlike the scheme in this case, were not entitled to recover any more than what each entrusted to the broker, less any "interest" or other payments

received by the claimant. *Id.* at 610. As the court noted, under SIPA, claimants only have a claim to that which they entrusted to the broker, which is only the principal amount invested. *Id.* Because SIPA's definition of net equity does not include interest, the court overruled the claimants' claim that they were entitled to recover the interest they expected to receive from the certificates of deposit. *Id.* In that case, however, all claimants agreed that the amount payable out of the SIPA fund should be reduced by any distribution the claimants received from the broker.

The Athens claimants argue that *C.J. Wright* is distinguishable, but offer no concrete reason for distinguishing it. Nor do the Athens claimants point to any other case that supports their position. Their only argument is that equity requires that all claimants be allowed whatever "interest" payments they might have rolled into a subsequent transaction. They contend that a person who received an interest payment but chose to keep that payment rather than roll it into another transaction cannot now be forced to disgorge that interest payment, and thus that it would be inequitable to force the claimants to disgorge those payments. The Athens claimants also urge the Court to ignore the disposition of the claims of the Heebner and Brown claimants because those claimants did not contest the offset applied by the Trustee.

■ There is very little caselaw on point for determining what constitutes a customer's net equity in a situation such as this. Indeed, *C.J. Wright* is one of the only cases involving a Ponzi scheme scenario that addressed the applicability of an offset for payments received. The Court is convinced, however, that the reasoning of *C.J. Wright* is sound and, moreover, is fully applicable to the instant matter. Especially where the payments to claimants

will be made out of the quasi-public SIPA fund, permitting claimants to recover not only their initial capital investment but also the phony "interest" payments they received and rolled into another transaction is illogical. No one disputes that the interest payments were not in fact interest at all, but were merely portions of other victims' capital investments. If the Court were to agree with the Athens claimants, the fund would likely end up paying out more money than was invested in Zimmerman's Ponzi scheme. This result is not consistent with the goals of SIPA, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors. *See Packer, Wilbur,* 498 F.2d at 983.

Moreover, to allow the Athens claimants to keep the "interest" payments they received would create inconsistent results within the same case. The Heebner and Brown claimants' claims have been fully litigated, and those claims were offset by payments those claimants received from ONSI. Similarly, Ms. Kovacs' claim is offset by the payments she received. The Athens claimants offer no reason why they should reap the benefit of the payments they received when none of the other claimants reaped such benefit.

The Court is convinced that the Trustee correctly calculated the amounts due the Athens claimants, other than Stephen and Linda Compos, whose claim is denied in its entirety. Each claimants' claim must be reduced by any amounts the claimant received from ONSI or from CMSI, whether as "interest," return of principal, or any other payment. To the extent the Bankruptcy Court's order failed to address this issue or failed to apply the offsets requested by the Trustee, that order is reversed.

3. *Costs and fees*

■ On the last page of their opposition memorandum, the Athens claimants ask the Court to give them pre- and post-judgment interest and taxable costs of litigation, or to remand that issue to the Bankruptcy Court for determination. They offer absolutely no argument or case-law support for this request. There is nothing in the record to indicate that the Athens claimants have ever filed a formal claim for such interest or costs.

SIPA does not provide for the payment of any interest to customer/claimants. *C.J. Wright,* 162 B.R. at 610. Nor is there any provision for the payment of costs or attorney's fees. Moreover, as the Trustee notes, the Athens claimants' failure to file a bill of costs in compliance with the Local Rules precludes any claim for recovery of litigation costs. *See* M.D. Fla. Bankr.L.R. 7054–1. The Athens claimants are not entitled to recover any interest, costs, or attorney's fees from the Trustee in this matter.

**CONCLUSION**

Based on the files, record, and proceedings herein, the Court determines that the Trustee's decision to deny customer status to Compos, McDermott, and CMSI is correct, and that the Trustee correctly calculated the amounts due the Athens claimants. Accordingly, **IT IS HEREBY ORDERED** that:

1. The Order Granting Motion to Alter/Amend Judgment (Bankr.Doc. No. 278) is **AFFIRMED in part** and **REVERSED in part** as follows:

   a. Claimants Stephen and Linda Compos' objections to Trustee's determination are **OVERRULED;**

   b. The remaining claimants' claims shall be limited to their actual investments less any payment re-

ceived as interest, return of principal, or otherwise, as set forth more fully above;

2. The Order Overruling Objections to Trustee's Determination of Claim Nos. 137 and 138 of Dean McDermott and Compos–McDermott Securities, Inc. (Bankr.Doc. No. 305) is **AFFIRMED;**

3. The Order Sustaining Objections to Trustee's Determination of Claim No. 136 of Kathleen Kovacs (Bankr.Doc. No. 312) is **AFFIRMED;** and

4. The Clerk is **DIRECTED** to transmit a Certified Copy of this Order to the Clerk of the United States Bankruptcy Court.