### In re OLD NAPLES SECURITIES, INC., Debtor.

### Securities Investor Protection Corporation, Applicant,

v.

### Old Naples Securities, Inc., Defendant.

### Theodore H. Focht, Trustee, Plaintiff,

v.

### Dean Mcdermott, Stephen Compos, and Compos–McDermott Securities, Inc., Defendants.

Bankruptcy No. 96–896.
Adversary No. 98–468.

United States Bankruptcy Court,
M.D. Florida,
Ft. Myers Division.

April 17, 2006.

David B. Goroff, Foley & Lardner, LLP, Chicago, IL, Donald A. Workman, Lead Attorney, Baker & Hostetler, Washington, DC, Lori V. Vaughan, Mark J. Wolfson, Foley & Lardner, Tampa, FL, for trustee, Plaintiff.

Stephen Compos, Bethlehem, PA, pro se.

Jason B. Burnett, GrayRobinson, P.A., Lee S. Haramis, Lead Attorney, Becker & Poliakoff, P.A., Jacksonville, FL, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION

ALEXANDER L. PASKAY,
Bankruptcy Judge.

THE MATTER under consideration is a Final Evidentiary Hearing held in this adversary proceeding filed by Theodore H. Focht as Trustee (Trustee) appointed for the liquidation of the assets of Old Naples Securities, Inc., (ONSI or the Debtor), under the Securities Investors Protection Act of 1970 as Amended, 15 U.S.C. §§ 78aaa, et seq (SIPA). The Trustee, in a twenty-seven-count Complaint, named as defendants: Dean P. McDermott; Stephen Compos; and Compos–McDermott Securities, Inc. (CMSI). A separate default judgment was obtained against Compos, and only the claims against McDermott and CMSI were heard at trial. The claims asserted in the Complaint are as follows.

The claim in Count III is asserted against McDermott and seeks to recover funds in the amount of $91,040.00 based on Section 548(a)(1)(A)and Section 550, alleging a fraudulent transfer made with actual intent to defraud. The claim in Count IV is against McDermott for the same amount based on the alternative theory of Section 548(a)(1)(B) and Section 550.

Count V is a claim asserted against CMSI, and seeks to recover the amount of $164,150.00 on the theory of Section 548(a)(1)(A) and Section 550. In Count VI the Trustee seeks to recover the same from CMSI on the alternative theory of Section 548(a)(1)(B) and Section 550.

In Count XI the Trustee seeks to recover from McDermott the sum of $115,040.00

based on the claim of a fraudulent transfer pursuant to Section 544(b) and Fla. Stat. § 726.105(1)(a). In Count XII the Trustee seeks to recover the same amount on the alternative theory of Section 544(b), and Fla. Stat. § 726.105(1)(b)(1). In Count XIII the Trustee seeks to recover from McDermott the same amount on a claim based on Section 544(b) Fla. Stat. § 726.105(1)(b)(2). In Count XIV the Trustee seeks to recover the same amount from McDermott based on Section 544(b) and Fla. Stat. §§ 726.106(1) and 726.109.

In Count XV the Trustee seeks to recover from CMSI the amount of $199,310.00 based on Section 544(b) and Fla. Stat. § 726.105(1)(a). In Count XVI the Trustee seeks to recover the same amount from CMSI based on 544(b) and Fla. Stat. § 726.105(1)(b)(1). The claim in Count XVII seeks to recover from CMSI the same amount based on 544(b) and Fla. Stat. § 726.105(1)(b)(2). In Count XVIII Trustee seeks to recover from CMSI the same amount based on Section 544(b) and Fla. Stat. § 726.106(1).

In Count XXII Trustee seeks to recover based on the negligence of McDermott and CMSI damages allegedly suffered by certain claimants of Compos, McDermott, ONSI, and by the Shaffer Claimants.

Count XXIII is based on alleged breach of fiduciary duty, duty of care, against McDermott and CMSI. The Trustee seeks to recover money damages for the damages suffered by the Shaffer claimants, the Compos–McDermott Claimants and ONSI customers.

In Count XXIV Trustee seeks to recover damages based on alleged breach of fiduciary duty, duty of loyalty asserted against McDermott and CMSI.

Count XXV is a claim asserted against McDermott and CMSI based on common law fraud and seeks damages suffered by the Shaffer, Compos, and McDermott claimants, and customers of ONSI.

Count XXVI is a claim asserted against McDermott and is based on civil conspiracy and seeks to recover damages of the Shaffer, Compos, and McDermott claimants and ONSI customers.

Count XXVII is based on negligent misrepresentation and asserted against McDermott and seeks to recover damages suffered by Shaffer claimants, Compos McDermott Claimants and the customers of ONSI.

In due course McDermott and CMSI filed their Answer coupled with affirmative defenses and demand for jury trial. In their Answer, the Defendants admitted some and denied some of the allegations set forth in the Trustee's Amended Complaint. In their Affirmative Defenses the Defendants set forth twenty-five affirmative defenses. Most of the Affirmative Defenses filed by the Defendants are not affirmative defenses under F.R.Civ.P. 8(c) as adopted by F.R.B.P. 7008(c), with the exception of the following: Ninth (transfer in the ordinary course of business); Eleventh Affirmative Defense (setoff); Sixteenth (estoppel); Seventeenth (collateral estoppel or res judicata); and Twenty-first (estoppel).

At the final evidentiary hearing the following was established by testimony and documentary evidence offered and admitted into evidence.

At the time relevant ONSI, a Florida Corporation, was owned and operated by one James Zimmerman. ONSI maintained its headquarters in Naples, Florida, and acted as an "introducing broker." ONSI did not have a seat on an exchange, thus, was not a clearing broker. As an introducing broker, ONSI had a small net capital requirement and was required to maintain a relationship with a clearing bro-

ker, in the present instance with Howe–Barnes Investments (Howe–Barnes), who was to execute and clear all the securities transactions forwarded to it by ONSI on behalf of the customers of ONSI.

Howe–Barnes, as a clearing broker, had the responsibility to keep track of all transactions and for record keeping and safe keeping part of the transaction. Howe–Barnes was to hold the securities purchased for the customers of ONSI and ONSI would not hold the securities purchased. The operation of ONSI was governed by the ONSI Manual, as required by NASD. (Pl.Exh.59) ONSI and its registered representatives were required to abide by the terms of the Manual. (Pl. Exh.64).

McDermott and Compos started CMSI in 1992 as a full-service discount brokerage firm. McDermott was the President and Chief Executive Officer of CMSI. (Exh. 58, at Comp. 3788). McDermott was in charge of running CMSI and as treasurer it was his duty to keep track of all monies. (Trial Tr. Vol. 2, p. 261). McDermott was also one of the two owners and directors of CMSI. (Trial Tr. Vol. 2, p. 261.)

McDermott supervised Compos, including his sales in general and specifically in regard to these transactions. McDermott had more than nine years experience in trading municipal bonds and he has been considered to be an expert in municipal bonds. McDermott advertised that he had a Ph.D. in the field of municipal finance and to have written dissertations on the subject of municipal bonds. It developed, however, that McDermott's Ph.D. was from a diploma mill obtained through correspondence from a bogus university in Mandeville, Louisiana. McDermott very well knew this fact because he participated in a suit filed by the Department of Justice against that school for false advertising and in a suit to refund tuitions.

Some time in 1992, Zimmerman established a Branch Office for ONSI in Bethlehem, PA. (Branch Office). McDermott and Compos transferred their broker's licenses to ONSI and McDermott became the head of the Branch Office and ran the ONSI Branch Office out of the office space used by CMSI. ONSI issued to McDermott, Compos, and five other individuals who worked at the Branch Office employee I.D. numbers. Compos and the other representatives in the Bethlehem Branch worked under the supervision of McDermott. Both McDermott and Compos became registered representatives of ONSI, and signed a registered representative agreement which governed the commissions they could earn on municipal bond trades. As Branch Manager of ONSI in Bethlehem, McDermott's supervisory responsibilities included initializing correspondence to make sure that all transactions were in compliance with applicable regulations, preparing and maintaining the office's blotters, including the daily trade blotter, customer securities, and funds received blotters. (Trial Tr. Vol. 3, pp. 335–36; Exh. 69).

McDermott was also responsible for maintaining other records, including client records, central correspondence, customer account files, copies of new account applications, copies of all margin option joint account agreements, confirmations of sales, order tickets, open order files, and monthly statements. It was McDermott's responsibility to see that the tickets and the confirmations matched. Zimmerman authorized McDermott to fill in the names and amounts on checks Zimmerman forwarded to him to be signed. McDermott commonly filled in checks regarding other transactions prior to the transaction involved in this litigation, including payment of his own commissions.

## HISTORICAL BACKGROUND ON THE PONZI SCHEMES

In early 1995, Zimmerman talked to McDermott and explained to him that he had an opportunity to get involved in a bond deal with an institutional client. According to Zimmerman, these bonds were to be purchased on the market then sold to a buyer on a "delayed delivery basis." (Exh. 77; Trial Tr. Vol. 3, pp. 425–426). Zimmerman didn't tell McDermott who the institutional client was or how Zimmerman learned about this opportunity. As outlined to McDermott, under this program he and his customers would buy bonds from ONSI and then sell them back to ONSI thirty to forty-five days later. It is without dispute that the proposition that ONSI would repurchase the bonds was not documented and was based on an oral promise by Zimmerman on behalf of his clients. Under this scheme, ONSI would repurchase the bonds sold to the customers. It appears that none of the clients would deal with Zimmerman directly ever, and McDermott did not know to whom ONSI would supposedly resell these bonds after repurchase.

The entire scheme was based on the proposition that McDermott and his clients would make money on this transaction, which would be the profit on the resale of the bonds based on the oral repurchase agreement. According to McDermott, the funds invested by his clients would be leveraged into a larger bond investment fund established by ONSI. Under this setup, McDermott's clients would provide ten percent of the purchase price and the balance would be provided by ONSI. McDermott never obtained any documentation or proof that ONSI was actually providing any funds towards the purchase of these bonds. McDermott never knew that ONSI ever obtained any loan or had suffi-cient capital to provide the ninety percent toward the purchase of the bonds.

After the investigation was commenced by the SEC, McDermott told the investigators that the Scheme contemplated the purchase and sale of the bonds on a "pre-sold" basis. This simply meant that no bonds would be purchased by ONSI until another party agreed to repurchase the bonds from ONSI within thirty to forty-five days. McDermott admitted, however, that he believed that there was no presale of bonds until after all his clients had already sent their money to ONSI.

The evidence is clear that McDermott knew that none of the bonds which were to be purchased could be held in the name of his clients. It is equally clear that at the time the clients sent their funds to ONSI, McDermott did not know what deals ONSI might make with his clients' money. But most importantly, McDermott did not know how ONSI would repay his clients for their investment.

During the relevant time, there were eight transactions in which McDermott and his clients were involved (together, the Transactions). The expected investment return to the clients changed after the first transaction. On the first transaction, McDermott expected that after thirty to forty-five days, his clients would receive the return of all the money they invested, plus an additional 10% profit. It is not difficult to conclude that that would have been an annual investment return between 81 and 122% of the funds invested. After the first transaction the transactions took on a more conservative hue because the return to the clients was only 7%, which was an annual return of only 57 to 85%.

It is without dispute that McDermott was expected to earn a commission on these transactions. On the first transaction, McDermott was to receive a 6% commission in addition to the return on his

investment, which would represent an annual commission between 49 and 73%. (Exh. 27). In all of the transactions, McDermott was to receive a 9% commission, representing an annual commission between 73 and 109%. It is without doubt that McDermott knew that ultimately he would receive more commissions than his clients in the Bethlehem Branch would receive on their investments. Thus, the expected return in commissions to McDermott would total an annual rate of return on each transaction that could top 190% of the funds he himself actually contributed.

CMSI was also to receive the same percentages of commission as McDermott on each investment made by the Bethlehem Branch clients. While McDermott's clients had received confirmations for earlier legitimate transactions with ONSI, McDermott knew they would not receive documentation on these transactions. McDermott ultimately admitted that the transactions were in fact a Ponzi scheme.

McDermott started to solicit clients for these transactions in early 1995. Over the course of approximately one year, he assured the clients that these were riskless transactions, and they would be assured that, as a worst-case scenario, they would receive their principal back, that the transactions were safe, and that there was no downside risk.

It is without dispute that Compos also assured the clients that he solicited that these were riskless investments. McDermott asserted at the trial that the term "riskless" is commonly used in the municipal bond industry, referring to "simultaneous or riskless" transactions. It should be noted that at that time this term was not used in bond transactions and was not part of the glossary used by the Municipal Securities Regulations Board (MSRB). (Joint Exh. A).

McDermott admitted that none of these were simultaneous transactions. It is without any dispute that in a transaction which lasted longer than one day, the bonds purchased had to be entered into the broker's inventory. The lag time in these transactions ran between thirty to sixty days and, therefore, these bonds were required to be carried as inventory of ONSI. McDermott claims he never saw such a journal entry or any evidence that any bonds were actually on deposit with ONSI.

The Transactions grew larger over time. In the first transaction, two clients of McDermott and one of his fellow brokers invested in the approximate amount of $275,000 on February 1995. (Exh. 27). At the close of the first transaction, it appears that McDermott received back 16% more than what he put in, which included a 6% commission. His clients also received 10% more than they put in, representing the equivalent annual return on the investment of between 31 and 122%.

The second transaction closed in July 1995. Beginning with this transaction, the return to the clients decreased from 10% to 7% for an investment which lasted thirty to forty-five days, while the commissions paid to McDermott and CMSI increased from 6% to 9%.

The second transaction had two parts. In the first part there were five investors who contributed $200,000. In the second part there were five investors contributing $225,000. Four of the five investors also invested in the first part. The third transaction consisted of ten investors and this deal was closed in November 1995. (Exh. 27). The investment totaled $335,000.

The fourth transaction consisted of ten investors investing $300,000. This was closed in November 1995. The fifth transaction had twelve investors investing $450,000. This deal closed in December

1995. In this transaction, for the first time, checks issued by ONSI to repay investors bounced and were dishonored for insufficient funds. Notwithstanding, the sixth transaction still had eleven investors, who invested $550,000. This transaction was to close in February 1996.

On January 25, 1996, four of these eleven original investors and two new investors put in an additional $200,000, ostensibly to furnish new capital to Zimmerman. The seventh transaction consisted of twelve investors who invested $800,000. This deal was closed in April 1996.

The last transaction involved seventeen investors investing a grand total of $1,140,000. It is ironic that McDermott, CMSI, and Compos themselves were involved in this transaction as investors. The solicitation for investment began April, 1996, and was scheduled to close in May 1996, but never did. On this transaction alone, the investors with the Bethlehem branch suffered losses that eventually had to be covered by advances from SIPC.

McDermott admits that in the first seven transactions, he made $125,240 on his investment, and CMSI made $112,810. (Exh. 27). Of course, when the last transaction should have closed, nothing happened, and inevitably the customers started to call about the delay in settlement. McDermott did not investigate the cause for the delay. In June or July 1996, McDermott and his father flew to Naples and went to see Zimmerman, who was surprised to see them. Zimmerman told McDermott that unfortunately ONSI recently suffered substantial losses in the commodities market and some of the money lost was the investment by McDermott and his clients. Zimmerman said that he used these monies to shore up the shortfalls in the commodity trading of ONSI. Zimmerman assured McDermott, however, that some of the bond deals were settled but that he had problems settling the transactions for the remainder of the bonds.

McDermott pressed Zimmerman for payments and Zimmerman gave him eight blank checks. McDermott decided which of the clients could be paid by these checks. It appears that McDermott paid five Bethlehem Branch clients on July 16, and of these five, four were clients he solicited for these transactions. McDermott only paid one of Compos's clients, because Compos pleaded that his client was buying a house and needed the funds immediately. McDermott paid the five investors not only the amount of their investment in the last transaction, but also what each had expected to earn had the last transaction settled as planned. The remaining twelve Bethlehem investors did not receive anything, and never received a return of their original investments.

In August 1996, McDermott discussed the business with ONSI with Daniel Shaffer, who was the branch manager of the Wyomissing, Pennsylvania, ONSI branch, because Shaffer had also had similar transactions with Zimmerman. His clients also expected to be repaid, but received nothing.

On August 4, 1996, when McDermott and Shaffer confronted Zimmerman, he admitted having stolen all the money. McDermott and Shaffer referred the matter to their counsel who, in turn, referred the matter to the FBI and the SEC.

These are the relevant facts established at the trial presented by the Trustee in support of the claims asserted in the Complaint. The primary thrust of the Trustee is that McDermott is liable based on his participation in the Ponzi Scheme just described. According to the Trustee, McDermott breached his duty when he ignored the risks of the Transactions, as

he believed that SIPC would pay for any losses the investors might have suffered and was convinced that SIPC would cover the customers' claims if ONSI filed bankruptcy.

### FRAUDULENT TRANSFER CLAIMS

■ The Trustee asserts the right to recover money damages from McDermott and CMSI in Counts III–VI and XI–XVIII, based on the fraudulent transfer statutes in 11 U.S.C. § 548 and §§ 726.105, .106, Florida Statutes, applicable in conjunction with 11 U.S.C. § 544(b). Claims III, V, XI, and XV are based on both Section 548(a)(1)(A) and section 726.105(1)(a), Florida Statutes. Both provisions require the proof of substantially identical elements, and have been interpreted in the same manner. *See In re McCarn's Allstate Fin., Inc.,* 326 B.R. 843, 849 (Bankr.M.D.Fla.2005); *Woodard v. Stewart (In re Stewart),* 280 B.R. 268, 273 (Bankr.M.D.Fla.2001). Both the bankruptcy and state law provisions require a transfer, within a certain time period (one year prior to commencement of the liquidation proceeding under bankruptcy law, four years under state law), and the actual intent to hinder, delay, or defraud creditors.

■ It is clear that the payments of commissions and interests to McDermott and CMSI were transfers of an interest in property of the Debtor. Funds obtained by the Debtor, even if obtained in furtherance of a Ponzi scheme, are property of the debtor for the purposes of the fraudulent transfer provisions. *Danning v. Bozek (In re Bullion Reserve of N. Am.),* 836 F.2d 1214, 1217 (9th Cir. 1988); *Merrill v. Abbott (In re Indep. Clearing House Co.),* 41 B.R. 985, 999 (Bankr.D.Utah 1984). The transfers occurred within one or four years of liquidation.

■ The final requirement, the debtor's actual intent to hinder, delay, or defraud creditors, must generally be determined from a totality of all the testimonial and documentary evidence. *See In re Ste. Jan–Marie, Inc.,* 151 B.R. 984 (Bankr. S.D.Fla.1993); *In re Top Sport Distribs., Inc.,* 41 B.R. 235 (Bankr.S.D.Fla.1984); *In re Missionary Baptist Found. of Am., Inc.,* 24 B.R. 973 (Bankr.N.D.Tex.1982). Actual fraud is generally not susceptible to direct proof; instead it must be "gleamed [sic] from inferences drawn from a course of conduct." *In re Toy King Distribs., Inc.,* 256 B.R. 1, 127 (Bankr.M.D.Fla.2000) (quoting *Freehling v. Nielson (In re F & C Servs., Inc.),* 44 B.R. 863, 872 (Bankr. S.D.Fla.1984)). Courts look to certain badges of fraud to draw the necessary inferences. *Id.* at 128; *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.),* 275 B.R. 641, 656 (Bankr. M.D.Fla.2002). The Eleventh Circuit has adopted the badges of fraud contained in the Florida fraudulent transfer statute. § 726.105(2), Fla. Stat.; *Levine v. Weissing (In re Levine),* 134 F.3d 1046, 1053 (11th Cir.1998).

■ However, courts have held that consideration of the badges of fraud is unnecessary where a debtor was engaged in a Ponzi scheme. Proof of a Ponzi scheme by itself establishes actual intent to hinder, delay, or defraud creditors. As one court stated:

A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that

investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts* § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D.Utah 1987). Numerous courts have followed this reasoning. *See, e.g., Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.1995); *In re Agricultural Research and Tech. Group, Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); *Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966); *McCarn's*, 326 B.R. at 850; *World Vision*, 275 B.R. at 656; *In re C.F. Foods, L.P.*, 280 B.R. 103, 111 (Bankr.E.D.Pa.2002); *In re Randy*, 189 B.R. 425, 437 (Bankr.N.D.Ill.1995); *In re M & L Bus. Mach. Co., Inc.*, 164 B.R. 657, 662 (D.Colo.1994); *In re Taubman*, 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993).

■ This record leaves no doubt that the transactions under consideration were part of a classic Ponzi scheme invented by Zimmerman, the principal of the Debtor, and operated by the Debtor, through its principal Zimmerman. In a prior litigation, the Eleventh Circuit summed up the scheme in this way: "Zimmerman used some of [his investors'] contributions to pay Old Naples Securities' expenses, and he diverted some of the funds for his personal use. He used other contributions to pay back the principal and interest owed to earlier investors." *Focht v. Heebner (In re Old Naples Securities )*, 223 F.3d 1296, 1300 (11th Cir.2000). McDermott stated numerous times before trial that the Debtor was engaged in a Ponzi scheme, of which he was another victim. (Exh. 149, p. 229; Exh. 77; Exh. 148). The Trustee testified that this was a "classic Ponzi scheme". (Trial Tr. Vol 1, pp. 29–30).

Additionally, Zimmerman was indicted and pled guilty to creating a Ponzi scheme. Criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions. *See McCarn's*, 326 B.R. at 851; *In re Ramirez Rodriguez*, 209 B.R. 424, 433 (Bankr.S.D.Tex.1997); *Randy*, 189 B.R. at 439; *In re Mark Benskin & Co., Inc.*, 161 B.R. 644, 648–49 (Bankr. W.D.Tenn.1993).

■ McDermott and CMSI were paid commissions and return on their investments. These payments were made as a part and in furtherance of the Ponzi scheme operated by Zimmerman and the Debtor. Any acts taken or payments made in furtherance of a Ponzi scheme are made with the actual intent to defraud creditors. *See, e.g., World Vision*, 275 B.R. at 656 (payments of commissions to brokers in furtherance of Ponzi scheme were recoverable as fraudulent transfers). As such, the money McDermott and CMSI were paid constitute transfers made with the actual intent to defraud creditors.

■ The Trustee can recover the transferred funds from McDermott and CMSI, because they were the initial transferee of the funds from the Debtor. *See* 11 U.S.C. § 550(a)(1). McDermott claims that he was a victim of Zimmerman's fraud, had no knowledge of the true nature of the transactions, and should not bear the burden of Zimmerman's fraud. However, innocence in the underlying Ponzi scheme is not a defense to liability under the fraudulent transfer provisions. *See, e.g., McCarn's*, 326 B.R. at 853 ("it is irrelevant as a matter of law that the Defendants did not have knowledge of the Ponzi scheme."); *In re Mainely Payroll, Inc.*, 233 B.R. 591, 597 (Bankr.D.Me.1999) ("[n]either innocence in action nor unfairness in result is a defense."); *Richardson v. F.D.I.C. (In re M. Blackburn Mitchell*

*Inc.*), 164 B.R. 117, 125 (Bankr.N.D.Cal. 1994) ("it is crystal clear that even the 'innocent' initial transferee is liable for the fraudulently transferred funds.").

Here, the totality of the circumstances leaves no doubt that McDermott knew that these investments were too good to be true, were not true, and somebody was going to suffer loss as result when scheme collapsed. This Court is satisfied that this record is more than ample to find that the Trustee proved its claims under Section 548(a)(1)(A) and 726.105(1)(a), Florida Statutes. Accordingly the Trustee is entitled to a judgment in its favor against McDermott and CMSI on these counts.

**TORT CLAIMS**

This leaves for consideration the balance of claims asserted by the Trustee. Count XXII, based on negligence, Count XXIII, based on breach of fiduciary duty of care, Count XXIV, based on breach of fiduciary duty of loyalty, and Count XXV, based on common law fraud, are asserted by the Trustee against McDermott and CMSI. In these counts the Trustee seeks to recover money damages based on injuries suffered by the claimants who put in investments in the Debtor through McDermott and CMSI.

 Initially, this Court is satisfied that the Trustee has failed to show that CMSI owed any duty to the investors in the Transactions. McDermott and Compos were shareholders and principals of CMSI, but were registered representatives of ONSI. McDermott and Compos carried out their activities related to solicitation of investors in the Transactions as registered representatives of ONSI, not CMSI. There was no evidence presented that any of the investors relied on CMSI as an independent entity in any way in their decisions to invest in the Transactions. Therefore, the claims against CMSI based on tort liability must fail.

With regard to McDermott, there is a significant amount of overlap in the facts underlying the separate tort theories asserted by the Trustee. The facts that lead to the conclusion that McDermott breached his fiduciary duty to his clients are also crucial in establishing McDermott's liability on the grounds of negligence.

 As a broker selling securities, McDermott owed his clients fiduciary duties of care and loyalty. *See First Union Discount Brokerage Servs. v. Milos,* 997 F.2d 835, 845 (11th Cir.1993); *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1049 (11th Cir.1987); *Ward v. Atlantic Sec. Bank,* 777 So.2d 1144, 1147 (Fla. 3d DCA 2001). These duties include:

> "(1) the duty to recommend [investments] only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing; (5) the duty not to misrepresent any material fact to the transaction; and (6) the duty to transact business only after receiving approval from the customer."

*Gochnauer,* 810 F.2d at 1049, quoting *Leib v. Merrill Lynch,* 461 F.Supp. 951, 953 (E.D.Mich.1978).

 To establish a claim for negligence, the plaintiff must show: the existence of a duty on the part of the defendant to protect the plaintiff from injury; a breach of that duty on the part of the defendant; and damages suffered by the plaintiff as a result of the defendant's breach. *See, e.g., Clay Electric Cooperative v. Johnson,* 873 So.2d 1182 (Fla.2003); *Moransais v. Heathman,* 744 So.2d 973,

975 (Fla.1999). The Trustee claims that McDermott breached the duty owed to his clients through the broker-investor relationship by failing to investigate the transactions, failing to advise the customers of the risks of the Transactions, and making misrepresentations.

The Trustee argues that McDermott failed to investigate the ONSI bond transactions, and misrepresented the degree of risk associated with the transactions to his clients. When McDermott failed to investigate and recommended the Transactions to his clients, he breached his fiduciary duty to them, and was negligent. To establish both a breach of fiduciary duty and negligence, the Trustee relies on McDermott's actions when confronted with a series of "red flags" that called into question the validity and legitimacy of the Transactions. The Trustee points to these "red flags" as putting McDermott on notice of the questionable nature of the Transactions.

The first "red flag" was that the bonds in the Transactions did not go through Howe–Barnes. Howe–Barnes was the clearing firm that the Debtor, an introducing firm, used for its transactions. A clearing firm has a higher net capital requirement than an introducing firm, and the introducing firm is required to transfer the custody of securities to the clearing form. (Trial Tr. Vol. 5, pp. 822–23). McDermott testified that previous bond transactions went through Howe–Barnes, and clients received a statement from Howe–Barnes, or received the bonds themselves. The Transactions bypassed Howe–Barnes entirely.

Additionally, the Transactions were not evidenced by the customary documentation found in municipal bond transactions. Such documentation includes confirmations, monthly statements, blotter entries, and trade tickets. (Trial Tr. Vol 4, pp. 684–5; Vol. 5, pp. 828–34). McDermott, who participated in the transactions as both an investor and a broker, testified that he saw none of the documents showing that the trades actually went through and were made. (Trial Tr. Vol. 4, p. 561).

The rate of return for the participants in the Transactions, including McDermott and CMSI, and the commissions paid to McDermott and CMSI, were significant. Clients received an annual rate of return of between 50–85%. (Exh. 27). McDermott received annual commission rates of 73–109%, and 96–190% return on his investment. (Exh. 143, pp. 63–65). The return on the Transactions diminished as the scheme progressed, but the commissions remained the same. (Trial Tr. Vol. 4, p. 533; Exh. 27). Moreover, McDermott understood the clients were receiving substantially more money on each Transaction than Zimmerman was to receive. (Trial Tr. Vol. 4, p. 578–79; Exh. 149, pp. 434–35).

Client funds went to Old Naples Financial Services, not ONSI. ONSI was the securities firm. ONFS was not a registered broker-dealer, and McDermott was not a registered representative of ONFS. However, ONFS was prominently involved in the Transactions. ONFS received the investors' funds, and made return and commission payments to the clients and McDermott. (Trial Tr. Vol. 4, pp. 563–565). The Transactions were the only instances in which ONFS was so involved.

One group of checks that Zimmerman gave to McDermott to give to his clients, in the Fifth Transaction, was returned due to insufficient funds. (Trial Tr. Vol. 4, pp. 550–552; Exhs. 89, 92, 113). The checks were drawn on an ONFS account, not an ONSI account. Zimmerman told McDermott that the checks bounced due to a late wire. (Trial Tr. Vol. 4, p. 553).

During the Sixth Transaction, Zimmerman told McDermott he needed more capital. The Transactions were supposed to be on a pre-sold basis, and no other transaction required additional capital. (Exh. 149, pp. 335–26).

In March 1996, McDermott received a Form 1099 from ONSI that did not list any income from the Transactions. McDermott inquired to Zimmerman, who told McDermott it was an accounting error, and would be corrected. (Trial Tr. Vol. 4, p. 557). Although the incorrect Form 1099 made him suspicious, McDermott did not investigate that matter further, and did not check his clients' tax documents. (Trial Tr. Vol. 4, pp. 558, 647).

During the Transactions, Zimmerman pre-signed checks, and had McDermott fill in the amount and name of the client to be paid. (Trial Tr. Vol. 4, p. 579).

Given these "red flags," and confronted with these issues, McDermott should have investigated the Transactions and taken steps to ensure that the investments he was recommending to his clients were proper. In fact, McDermott should have known that the Transactions were not genuine.

Notwithstanding his testimony at the trial to the effect that it is not required for a broker to use a clearing firm for municipal bond transactions, McDermott knew that previous bond transactions were cleared through Howe–Barnes. (Exh. 22).

It is without dispute and it is clear from this record that McDermott never received or ever saw and documentation for these transactions, such as trade tickets; confirmations of sales and purchases; and monthly statements of a particular account. There must be a purchase and sale blotter entry maintained, which was not done here. No monthly or quarterly statements were given to the clients, nor was any 1099 tax forms when there was a sale or dividend paid to a customer. In sum, McDermott never received any proof whatsoever that these trades actually occurred.

It is hard to accept the proposition that McDermott, a highly sophisticated and savvy business man, was not fully aware from the outset that the operation set up by Zimmerman was based on a fraudulent scheme. It certainly does not take much to come to that conclusion if someone offers a return on an investment in thirty to forty-five days at an annual rate of 81–120%. Moreover, in all of the transactions, McDermott was to receive a 9% commission, representing commissions on an annual basis of 73–109%. (Exh. 27).

McDermott should have known, being familiar with the transactions and rates of return in the transactions, that with interest he would receive an annual rate of return of 190% on funds that were actually contributed. The evidence is crystal clear that McDermott knew there was no purchase of bonds ever documented, and none of the investors, including himself, received confirmation letters or other indicia of an ordinary bond transaction. Having been in the securities business and claiming to be an expert, he very well knew that all transactions had to be conducted through a broker that was authorized to trade on an exchange, such as Howe–Barnes, which in fact the Debtor used in the past. McDermott should have realized that no such broker was used in the trades, even if he believed such trades in fact occurred.

McDermott claims that the amount of return and commissions were based on the leveraged nature of the transactions. He explained his belief that the transactions were "riskless" because the bonds were bought on a pre-sold basis, and that when the initial transactions closed successfully, he gained more confi-

dence in his understanding of the Transactions. However, as the District Court stated in a related proceeding, "it stretches credibility that McDermott would have believed that these supposedly 'risk-free' transactions with extraordinary guaranteed rates of return were in fact legitimate transactions in securities.... McDermott's profession of ignorance in this case is tantamount to willful ignorance." *Focht v. Athen, et. al.* (*In re Old Naples Sec., Inc.*), 311 B.R. 607, 613 (M.D.Fla.2002) (upholding this Court's denial of "customer" status under SIPA to McDermott). McDermott should have known something was wrong with the Transactions, and should have investigated further before recommending the investment to his clients. Failing to do this, McDermott breached his fiduciary duty to his clients.

 Additionally, failing to disclose and fully explain the risk of an investment to an investor can be a breach of the broker's fiduciary duty. *See, e.g., Gochnauer,* 810 F.2d at 1050 (stating that broker had duty to "fully explain the risk" of an investment); *Clayton Brokerage Co. of St. Louis, Inc. v. Commodity Futures Trading Comm.,* 794 F.2d 573, 580 (11th Cir.1986) (broker has duty to disclose "all material information about risk to customers.").

McDermott told his clients that the Transactions represented riskless, or "risk-free," investments. According to McDermott, he told his clients the investment was riskless because ONSI would not buy the bonds unless there was a buyer lined up, and the bonds would be bought on a pre-sold basis. (Trial Tr. Vol. 2, pp. 226–227; Vol. 4, pp. 488–489). However, McDermott never disclosed the purchasers of the bonds to his clients. (Exh. 149, p. 267; Exh. 151, p. 19; Exh. 153, p. 100).

Although not in use at the time of the Transactions, the term "riskless" transaction is a part of the Municipal Securities Rulemaking Board Glossary. However, McDermott testified that the bonds in the Transactions were held more than one day, and therefore needed to be entered as inventory and carried on the books of ONSI. (Trial Tr. Vol. 4, pp. 501–507). McDermott never saw an entry confirming that this was the case. (Trial Tr. Vol. 4, p. 507). Additionally, because the bonds to be held by ONSI for up to two months, there were a number of risks to which the investments were subject, as in fact occurred. (Trial Tr. Vol. 4, pp. 507–508). Even if the Transactions were structured and occurred as McDermott understood them, they were not "riskless." When McDermott told his clients the Transactions were riskless and did not fully detail the degree of risk involved, he breached his fiduciary duty.

 This Court is satisfied that, based on the testimonial and evidentiary record in this proceeding, McDermott is liable to his clients based on a breach of fiduciary duty and negligence. However, this finding as to liability only resolves a part of the Trustee's claim. The Trustee seeks as damages all expenses that were not recovered out of the Debtor's estate. The Trustee's damages theory is that McDermott should have known the Debtor was engaged in a Ponzi scheme and should have put a stop to it earlier than he did.

While this Court is satisfied that McDermott breached his fiduciary duties and was negligent, his liability runs only to those clients whom McDermott solicited for the Transactions and who relied on McDermott's advice. A review of the depositions admitted into evidence in this case reveals that McDermott did solicit many individuals to participate in the transaction. (Koncsics, Exh. 150, p. 64; Kemmerer,

Exh. 151, pp. 24, 46–47; Kovacs, Exh. 160, pp. 49–52; Trial Tr. Vol. 3, pp., 407–8, Vol. 4, pp. 485–6, 585–6). McDermott's clients had faith in him. (Trial Tr. Vol. 4, p, 486; Konscics, Exh. 150, p. 57–58; Kemmerer, Exh. 151, p. 17–20; R.V. Littner, Exh. 153, p. 66–67; R.H. Littner, Exh. 152, pp. 20, 25).

However, Compos solicited a number of the participants in the Transaction. (Athens, Feb 10, 1998, pp. 7–8, 15–16; Linda Compos, Feb. 10, 1998, p. 4; Conroy, Feb. 11, 1998, pp. 11–12, 24; Fotopoulos, Feb. 11, 1998, pp. 5–6, 16; Heist, Feb. 11, 1998, pp. 19, 29; Kourpas, p. 11; Linden, Feb. 12, 1998, pp. 8–15, 35–38; Loupos, Feb. 12, 1998, pp., 8, 19). While Compos relied on McDermott for assistance on the technical aspects of bond deals in general, he stated that he relied on Zimmerman in the Transactions because Zimmerman was the chief compliance officer of the firm. Based on his discussions with Zimmerman, Compos solicited his own clients. (Compos SEC depo, pp. 48–62; Compos Claims depo, Feb. 10, 1998, pp. 40–54; Compos, July 8, 2004 pp. 69–81, 93). Further, many of the participants in the Transactions were solicited by Daniel Shaffer through the ONSI Wyomissing Branch Office.

McDermott's breach of his duties to his clients led to their involvement in the Transactions, and ultimately to their losses suffered in the Eighth Transaction, their claims filed under SIPA, and the Trustee's reimbursement of those claims. However, the Trustee can only recover the payments made to McDermott's clients from McDermott. This Court rejects the argument by which the Trustee seeks to impute liability for claims of investors solicited by Compos and Shaffer due to McDermott's position as a supervisor in the Bethlehem branch.

A review of the record reveals that there is a lack of evidence as to the Trustee's damages caused by McDermott's actions with respect to his clients, rather than any clients serviced by Compos or Shaffer. It cannot be gainsaid that the Trustee had the burden to prove, with the requisite degree of certainty, the damages it suffered. The Trustee failed to prove its damages, and therefore cannot recover.

Accordingly it is

ORDERED, ADJUDGED AND DECREED that payments made by the Debtor to McDermott totaling the amount of $115,040 are voidable as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(a), and § 726.105(1)(a), Florida Statutes.

ORDERED, ADJUDGED AND DECREED that payments made by the Debtor to CMSI totaling the amount of $203,310 are voidable as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544(a), and § 726.105(1)(a), Florida Statutes.

ORDERED, ADJUDGED AND DECREED that CMSI is not liable to the Trustee on any of the Tort Claims.

ORDERED, ADJUDGED AND DECREED that the Trustee failed to prove its damages resulting from McDermott's actions.

ORDERED, ADJUDGED AND DECREED that Counts XXII–XXVII be, and the same are hereby dismissed with prejudice.

A separate final judgment shall be entered in accordance with the foregoing.

DONE AND ORDERED.