**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: DERIVIUM CAPITAL LLC,

*Debtor.*

GRAYSON CONSULTING,
INCORPORATED,

*Plaintiff-Appellant,*

v.

WACHOVIA SECURITIES, LLC, f/k/a
First Union Securities,
Incorporated; WACHOVIA SECURITIES
FINANCIAL NETWORK LLC; FIRST
CLEARING LLC,

No. 12-1518

*Defendants-Appellees,*

and

KEVIN CAMPBELL,

*Trustee.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
William O. Bertelsman, Senior District Judge,
sitting by designation.
(2:11-cv-02710-WOB; 05-15042-jw; 07-80119-jw)

Argued: January 29, 2013

Decided: May 24, 2013

Before KING, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge King and Judge Diaz concurred.

---

**COUNSEL**

**ARGUED:** Tucker Harrison Byrd, MORGAN & MORGAN, PA, Orlando, Florida, for Appellant. Stephen Leonard Ratner, PROSKAUER ROSE, LLP, New York, New York, for Appellees. **ON BRIEF:** Alisa J. Roberts, GRAYSON LAW CENTER, PC, Falls Church, Virginia, for Appellant. David A. Picon, PROSKAUER ROSE, LLP, New York, New York, for Appellees.

---

**OPINION**

WYNN, Circuit Judge:

This is an adversary proceeding arising out of the bankruptcy of Debtor Derivium Capital, LLC ("Derivium"). Plaintiff–Appellant Grayson Consulting, Inc. ("Grayson"), assignee of the Chapter 7 bankruptcy trustee, appeals from a district court judgment affirming the bankruptcy court's decision to grant summary judgment for Defendants–Appellees Wachovia Securities, LLC, Wachovia Securities Financial Network, LLC, and First Clearing, LLC (collectively "Wachovia").

Derivium filed for bankruptcy after the collapse of its "stock loan" lending program, alleged to be a Ponzi scheme. Grayson sought to recover from Wachovia assets transferred into Derivium's brokerage accounts at Wachovia and commissions, fees, and margin interest payments paid to Wachovia as fraudulent conveyances under 11 U.S.C. §§ 544 and 548. Grayson also asserted tort claims against Wachovia related to its involvement in Derivium's stock loan program.

The bankruptcy court dismissed Grayson's tort claims under the doctrine of *in pari delicto*[1] and ultimately granted summary judgment for Wachovia on Grayson's fraudulent conveyance claims, determining that the asset transfers could not be avoided under the bankruptcy code and that Wachovia's commissions, fees, and margin interest payments were protected from recovery by the stockbroker defense, 11 U.S.C. § 546. The district court affirmed the bankruptcy court's decision, and Grayson appealed. For the reasons discussed below, we affirm.

## I.

Grayson's claims relate to Derivium's 90% Stock-Loan Program, in which Derivium customers transferred stocks to Derivium in exchange for three-year non-recourse loans worth ninety-percent of the stocks' market values. When the loans matured, customers had the option of repaying the principal plus interest and recovering the stock, surrendering the stock, or refinancing the loan for an additional term. Under an agreement with Derivium, customers participating in the program put their stocks into Wachovia[2] brokerage accounts (the "At-Issue Accounts") in Derivium's name and also in the names of Bancroft Ventures, Optech Limited, and WITCO Services Ltd. (the "Stock Loan Entities"). Customers were told that Derivium would hedge their collateral using a confidential, proprietary formula. Instead, Derivium's owners directed Wachovia to immediately transfer the stocks into other accounts and liquidate them. Derivium used the proceeds from the stock sales to fund customers' loans and Derivium's owners' start-up ventures.

---

[1] As restated later, *in pari delicto* is an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing. *See e.g.*, *Logan v. JKV Real Estate Servs.*, (*In re Bogdan*), 414 F.3d 507, 514 (4th Cir. 2005).

[2] Derivium also had brokerage accounts with other entities that sought and obtained withdrawal of reference from the bankruptcy court.

Ultimately, Derivium had difficulty satisfying its obligations to return customers' stocks when the loans matured. Wachovia closed the At-Issue Accounts in late 2004 and early 2005, and, in September of 2005, Derivium filed for Chapter 11 bankruptcy in the Southern District of New York. The court converted the case to Chapter 7 and transferred it to the District of South Carolina, where Kevin Campbell was appointed Derivium's trustee.

In August of 2007, Campbell filed a complaint against Wachovia alleging nine tort claims[3] and two bankruptcy claims under 11 U.S.C. §§ 544 and 548, provisions that entitle a bankruptcy trustee to avoid certain fraudulent transfers made prior to the bankruptcy filing to return assets to the estate for the benefit of the creditors. Specifically, Campbell sought to avoid and recover three categories of transfers under Sections 544 and 548: (1) $161 million in securities that customers transferred into the At-Issue Accounts (the "Customer Transfers"); (2) $828,500 in cash that Derivium and Bancroft transferred into Bancroft's At-Issue Account the year before Derivium filed for bankruptcy (the "Cash Transfers"); and (3) commissions, fees, and margin interest paid to Wachovia. With the approval of the bankruptcy court, Campbell assigned these claims to Grayson, and Grayson was substituted as the plaintiff in December of 2007.

In April of 2008, Wachovia moved for dismissal. The bankruptcy court dismissed the tort claims with prejudice under the doctrine of *in pari delicto* and dismissed the fraudulent conveyance claims with leave to amend. Grayson filed a Second Amended Complaint and Wachovia again moved to dismiss, which the bankruptcy court denied on Grayson's

---

[3]The Trustee's tort claims were: (1) aiding and abetting fraud; (2) aiding and abetting breach of fiduciary duty; (3) aiding and abetting fraudulent conveyance; (4) aiding and abetting conversion; (5) negligence; (6) breach of fiduciary duty; (7) conversion; (8) civil conspiracy; and (9) constructive trust.

claims related to actual conveyances of assets. Subsequently, Grayson filed a Third Amended Complaint omitting the nine dismissed tort claims, and the fraudulent conveyance claims proceeded to discovery.

During discovery, Wachovia filed a motion for summary judgment, which the court denied. After the close of discovery, Wachovia renewed its motion and also moved for summary judgment on the issue of whether the Stock Loan Entities were Derivium's alter egos. The bankruptcy court denied the motion on Grayson's alter ego theory, but granted in part and denied in part Wachovia's renewed motion on Grayson's fraudulent transfer claims.

Specifically, the bankruptcy court determined that: (1) Grayson cannot avoid the Customer Transfers because they were not transfers of debtor property as required by Section 548; (2) Grayson cannot avoid the Cash Transfers because Wachovia was not the "initial transferee" of the assets as required by Section 550; and (3) Wachovia's commissions, margin interest payments, and fees claimed under Section 544 were protected from recovery by Section 546, known as the "stockbroker defense," provided they were customary or reasonable in the securities industry. The bankruptcy court then conducted a hearing to determine whether Wachovia's commissions were reasonable and customary, found them to be so, and thus concluded that they were protected under the stockbroker defense. *In re Derivium Capital, LLC*, C/A No. 5-15042-JW, Adv. Pro. No. 07-80119-JW at 3–4 (Feb. 15, 2011).[4]

In April of 2012, the district court issued a one-paragraph decision affirming the bankruptcy court's orders. Grayson timely appealed.

---

[4]This order is found at J.A. 960–68.

## II.

In an appeal from a bankruptcy proceeding, this Court applies the same standard of review that the district court applied to the bankruptcy court's decision. *Goldman v. Capital City Mort. Corp.* (*In re Nieves*), 648 F.3d 232, 237 (4th Cir. 2011) (citing *Bowers v. Atlanta Motor Speedway, Inc.* (*In re Se. Hotel Props., Ltd. P'ship*), 99 F.3d 151, 154 (4th Cir. 1996)). Thus, we review factual findings for clear error and legal conclusions de novo. *In re Nieves*, 648 F.3d at 237. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

On appeal, Grayson contends that the district court erred in affirming the bankruptcy court's determinations that (1) the Customer Transfers were not transfers of debtor property; (2) Wachovia was not the initial transferee of the Cash Transfers; (3) the stockbroker defense applies to commissions; and (4) *in pari delicto* bars Grayson's tort claims against Wachovia. We address each issue in turn.

## A.

First, Grayson argues that the district court erred in affirming the bankruptcy court's grant of summary judgment for Wachovia on Grayson's Customer Transfers claim. The district court determined that Grayson cannot avoid the Customer Transfers because they were not transfers of "an interest of the debtor in property or any obligation incurred by the debtor" as required by 11 U.S.C. §§ 544(b)(1) and 548(a).

Grayson does not contend that Derivium had an interest in its customers' securities prior to the transfers. Rather, Grayson asserts that when Derivium acquired an interest in the securities through the transfers, Wachovia simultaneously

acquired an interest in the securities under the agreements governing the accounts into which the securities were transferred.

In its brief, Grayson relies heavily on *Bear, Stearns Securities Corp. v. Gredd* (*In re Manhattan Investment Fund Limited*), 397 B.R. 1 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 709 (2d Cir. 2009) ("*Manhattan Investment*"). In *Manhattan Investment*, the bankruptcy court permitted the trustee to avoid transfers *by a debtor* into a broker's margin account. *Id.* Here, the bankruptcy court distinguished *Manhattan Investment* by explaining that the Customer Transfers involved transfers of stock by third parties, Derivium's customers, rather than by the debtor, Derivium. That is, the transferred securities came *to* Derivium, not from or through Derivium. *Grayson Consulting, Inc. v. Wachovia Secs., LLC* (*In re Derivium Capital, LLC*), 437 B.R. 798, 807 (Bankr. D.S.C. 2010).

The purpose of the Bankruptcy Code's avoidance provisions is to prevent a debtor from making transfers that diminish the bankruptcy estate to the detriment of creditors. There is no dispute that Derivium had no rights to the securities until *after* the transfers were effectuated. Accordingly, the Customer Transfers at issue here simply were not transfers of debtor property, and thus the transfers in no way diminished the bankruptcy estate. This is true regardless of whether, as Grayson argues, Wachovia acquired an interest in the securities at the same time as Derivium.

Alternatively, Grayson argues that it can avoid portions of the Customer Transfers as "settlement payments" or "margin payments" under 11 U.S.C. §§ 548(a)(1)(A) and 546(e), asserting that Wachovia took funds from the At-Issue Accounts to satisfy margin debt. Appellant's Br. at 21, 38.

Although Section 546 provides that certain margin or settlement payments may be avoided under Section 548, Section

548 provides for the avoidance of such payments only if they were made from *debtor* property. *See* 11 U.S.C. § 546(e) ("Notwithstanding section[ ] . . . 548(a)(1)(B), and 548(b) . . . the trustee may not avoid a transfer that is a margin payment . . . or settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker."); *id.* § 548(a)(1) ("The trustee may avoid any transfer . . . of *an interest of the debtor* in property . . . .") (emphasis added). As discussed, the assets in the At-Issue Accounts were not Derivium's—i.e., debtor's—property until *after* the Customer Transfers occurred. And, as the bankruptcy court explained, Section 546 provides only a defense to otherwise avoidable transfers; it does not establish a category of avoidable transfers of nondebtor property. Thus, neither Section 548(a)(1)(A) nor 546(e) provides a basis for avoidance and recovery here.

In sum, because the Customer Transfers were not transfers of Derivium's property, we conclude that the district court did not err in affirming the grant of summary judgment for Wachovia on Grayson's Customer Transfers claim.

## B.

Next, Grayson contends that the district court erred in affirming the bankruptcy court's grant of summary judgment for Wachovia on Grayson's Cash Transfers claim.

The bankruptcy court determined that Grayson cannot recover the Cash Transfers from Wachovia because Wachovia was not the "initial transferee" of the assets as required by 11 U.S.C. § 550. In pertinent part, Section 550(a) provides that, to the extent a trustee may avoid a transfer under the Code, the trustee can recover the fraudulently transferred property from only the "initial transferee."[5]

---

[5]Because Grayson argued only that Wachovia was the "initial transferee," we do not consider whether Wachovia fits under the second prong of Section 550(a), which provides for recovery from "an immediate or mediate transferee of the initial transferee." *Id.* § 550(a)(2).

The Bankruptcy Code does not define the term "initial transferee." This Court applies the "dominion and control" test to determine whether an entity qualifies as the "initial transferee." *In re Se. Hotel Props.*, 99 F.3d at 155–56. Under the dominion and control test, an initial transferee must (1) have legal dominion and control over the property—e.g., the right to use the property for its own purpose—*and* (2) exercise this legal dominion and control. *Id.* ("[W]e explicitly adopt the dominion and control test . . . . We hold further that this test requires that . . . a person or entity must have exercised legal dominion and control over the property."). Here, the bankruptcy court determined that Wachovia neither had nor exercised legal dominion and control over the Cash Transfers and therefore was not the initial transferee of these funds.

Grayson argues that the agreements governing the At-Issue Accounts gave Wachovia legal dominion and control over assets transferred into those accounts. But regardless of whether the agreements gave Wachovia legal dominion and control of the At-Issue Accounts, the bankruptcy court determined that Grayson failed to show the requisite *exercise* of dominion and control. The bankruptcy court found that Wachovia never controlled the flow of assets into or out of the At-Issue Accounts nor used assets in the accounts for its own purposes: Whenever Wachovia moved and sold assets, it acted at the direction and consent of the account holder. *In re Derivium Capital, LLC*, 437 B.R. at 809. Nothing in the record suggests that these findings were erroneous.

Grayson nevertheless argues that Wachovia exercised control by removing from the At-Issue Accounts "commissions, margin interest, and 'prepayment fees.'" Appellant's Br. at 15–16; 31. Notably, these deductions did not equal the total amount of the Cash Transfers. The bankruptcy court concluded that the deduction of commissions and fees at the authorization of the account holder was not an exercise of control over the *entire* funds. *See also Sec. First Nat'l Bank*

*v. Brunson*, (*In re Coutee*), 984 F.2d 138, 141 (5th Cir. 1993) (holding law firm was not initial transferee of settlement funds in trust because "[t]he only control exercised over the funds was the control delegated to the law firm by the [clients]"). And again, nothing before us suggests that the court erred in its determination.

In sum, we agree with the bankruptcy court that, notwithstanding funds taken and retained as commissions and fees, Wachovia was not the initial transferee of the Cash Transfers. Accordingly, we conclude that the district and bankruptcy courts did not err in granting summary judgment for Wachovia on Grayson's Cash Transfers claim.

## IV.

Grayson next contends that the district court erred in affirming the bankruptcy court's determination that Wachovia's commissions and fees were protected as "settlement payments" under 11 U.S.C. § 546(e), the "stockbroker defense," once they were shown to be reasonable and customary in the industry. *In re Derivium Capital, LLC*, C/A No. 5-15042-JW, Adv. Pro. No. 07-80119-JW at 7 (Feb. 15, 2011). Grayson contends that Section 546 does not protect commissions, and even if it does, Wachovia's commissions here were uncommonly low and therefore should have been excluded from protection under the bankruptcy court's own test.

## A.

Whether brokers' commissions and fees can be shielded from avoidance and recovery as a "settlement payment" under 11 U.S.C. § 546(e) is a question of statutory interpretation. As with all such questions, we begin with the plain language of the Code.[6] Section 546(e) states that,

---

[6]It appears that there are no cases expressly addressing whether Section 546(e) immunizes commissions. But we note, as the bankruptcy court did,

> [n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . .

*Id.*[7]

Chapter 11 tautologically defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on

---

that several other bankruptcy courts have permitted recovery of brokers' commissions under the Code's fraudulent transfer provisions. None of these cases, however, considered the application of the stockbroker defense, nor does it appear that the defense would have been applicable. *See In re Derivium Capital, LLC*, 437 B.R. at 811 n.12 (citing *In re Old Naples Sec.*, 343 B.R. 310 (Bankr. M.D. Fla. 2006) (commission payments to broker were 73-109% of the transaction); *Bauman v. Bliese et al.* (*In re McCarn's Allstate Fin., Inc.*), 326 B.R. 843 (Bankr. M.D. Fla. 2005) (brokers received commissions for recruiting customers); *Cuthill v. Kime et al.* (*In re Evergreen Sec., Ltd.*), 319 B.R. 245, 249–51 (Bankr. M.D. Fla. 2003) (investment advisors who received commissions for referring customers were not "stockbrokers"); *Terlecky v. Abels*, 260 B.R. 446 (S.D. Ohio 2001) (brokers were employees of debtor and therefore not "stockbrokers")).

[7]We note that Section 546(e) also protects transfers made "in connection with a securities contract," as defined by the Code. In light of our conclusion that Wachovia's commissions come under "settlement payments," however, we need not consider whether these payments could have been protected under this alternative.

account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Id.* § 741(8).[8]

Section 546 does not limit the definition of settlement payment to security purchase prices or exclude from it payments from which brokers benefit, such as commissions. Indeed, Congress amended Section 546(e) in 2006 to add settlement payments made to *or for the benefit of* stockbrokers. *See* Financial Netting Improvements Act of 2006, Pub. L. No. 109–390, 120 Stat. 2692 (2006) (emphasis added). Nevertheless, the definition is sufficiently ambiguous as to whether commissions and fees come under "settlement payments" that we consider legislative intent.

The parties agree that the purpose of Section 546 is to preserve the stability of settled securities transactions. *See also Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990) (citing H.R. Rep. No. 420, 97th Cong., 2d Sess. 2 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583). Specifically, Congress stated that the purpose behind the provision was "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market" to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.R. Rep. No. 420, 97th Cong., 2d Sess. 2 (1982).

Citing this legislative history, several of our sister circuits have described the definition of "settlement payment" in Section 546 as "extremely broad." *QSI Holdings, Inc. v. Alford* (*In re QSI Holdings, Inc.*), 571 F.3d 545, 549 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th

---

[8]Section 101(51A) defines "settlement payments" for forward contracts to mean "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade."

Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*), 181 F.3d 505, 515 (3d Cir. 1999); *Kaiser Steel Corp. v. Pearl Brewing Corp.* (*In re Kaiser Steel Corp.*), 952 F.2d 1230, 1237 (10th Cir. 1991) (quoting *Kaiser Steel*, 913 F.2d at 849).

Because Congress included in the definition of "settlement payment" "any other similar payment commonly used in the securities trade," we also look to standard practices of the securities industry to inform the definition of "settlement payment." Several industry texts suggest that "settlement payment" means the transfer of funds paid in connection with completing a securities transaction. *See, e.g.*, NEW YORK STOCK EXCHANGE, LANGUAGE OF INVESTING GLOSSARY 30 (1981) (defining settlement as the "[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale"); GROUP OF THIRTY, CLEARANCE AND SETTLEMENT SYSTEMS IN THE WORLD'S SECURITIES MARKETS 86 (1989) (defining settlement as "[t]he completion of a transaction, wherein securities and corresponding funds are delivered and credited to the appropriate accounts"). Further, Black's Law Dictionary specifically includes a broker's commission as an example in the definition of "transaction cost." (9th ed. 2009) ("A cost connected with a process transaction, such as a broker's commission . . . .").

We underscore that not all payments to brokers labeled "commissions" are protected as "settlement payments" under Section 546(e). For example, commissions that are not part of the settlement of securities transactions, such as commissions paid for the solicitation of investors, cannot be protected as "settlement payments." Section 546(e) also would not protect commissions the amount of which, when compared to the transaction amount, indicates that they were not actually related to closing trades. But we conclude that Section 546(e)'s plain language, viewed through the lens of its legislative intent, does not exclude commissions and fees commonly

paid to stockbrokers as part of settling a regular securities transaction.

Accordingly, we hold that the bankruptcy court did not err in determining that commissions shown to be reasonable and customary parts of settling stock sales come within the stockbroker defense as "settlement payments."

B.

Grayson also contends that the district court erred in affirming the bankruptcy court's finding that Wachovia's low commissions were customary and reasonable. On appeal, Grayson argues that the discounted rate was conferred on fewer than two percent of Wachovia's customers and thus cannot be deemed reasonable and customary.

At the evidentiary hearing before the bankruptcy court, Wachovia presented the testimony of three individuals: George Gordon, the Wachovia account representative for the Derivium and Bancroft accounts; John Pinto, an expert on industry standards and rules governing broker commissions; and Vadim Khavinson, the president of the company that calculated Wachovia's commissions. Grayson did not present any witnesses.

Gordon testified that between 50% and 75% of Wachovia's clients received discounted rates, which ranged from 5% to 95% discounts. Pinto testified that it is "not unusual . . . for a brokerage firm to offer steep discounts to clients that provide a significant amount of business." J.A. 935. Further, Pinto testified that the rates charged were "fair, reasonable, and customary" and "well within the . . . FINRA, NASD rules." J.A. 930, 932–34.

Based on Wachovia's evidence, the bankruptcy court determined that although Wachovia charged Derivium and the Stock Loan Entities discounted commission rates, discounts

of the same or greater value "were not unusual for . . . large clients who conducted, or were expected to conduct, a significant volume of business with a full service brokerage firm." *In re Derivium Capital, LLC*, C/A No. 5-15042-JW, Adv. Pro. No. 07-80119-JW at 3–4 (Feb. 15, 2011). The bankruptcy court also found that the commissions were customary and reasonable under industry standards. *Id.* at 8. Given the evidentiary record, we conclude that the bankruptcy court did not clearly err in making this finding.

C.

Grayson also challenges the bankruptcy court's protection of Wachovia's margin interest payments as "margin payments" under Section 546. In its brief, Grayson summarily asserts that it "seeks to recover all commissions and margin interest payments taken by [Wachovia] from any At-Issue Account in the three-year pre-petition period under 11 U.S.C. § 544(b) and South Carolina's Statute of Elizabeth." Appellant's Br. at 18.

The Bankruptcy Code defines "margin payment" as a "payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency." 11 U.S.C. § 741(5). Like "settlement payment," courts have interpreted this term broadly. *See, e.g.*, *Hays v. Morgan Stanley DW, Inc.* (*In re Stewart Fin. Co.*), 367 B.R. 909, 917 (Bankr. M.D. Ga. 2007) ("'Margin payment' is a broadly construed term and includes any payment by a debtor to pay for the purchase of securities or to reduce a deficiency in a margin account.") (citing COLLIER ON BANKRUPTCY 5:546.06[2][a] at 546–48 (15th ed. rev. 2006)); *Kaiser Steel*, 913 F.2d at 849; *Biggs v. Smith Barney, Inc.* (*In re David*), 193 B.R. 935 (Bankr. C.D. Cal. 1996)).

Here, the parties agreed that "whether a margin interest payment constitutes a 'margin payment' turns on whether it reduces a deficiency in a margin account." *In re Derivium Capital, LLC*, 437 B.R. at 812. The bankruptcy court determined that because accrued interest increases the total debt owed, margin payments reduce the deficiency in a margin account, and thereby qualify as "margin payments" under Section 546(e). Nothing in the record or the bankruptcy court's reasoning suggests this was an error, particularly in light of the parties consensus on the term's meaning.

Accordingly, we conclude that the district and bankruptcy courts did not err in determining that margin interest payments qualify as "margin payments" under Section 546(e).

## D.

Grayson further argues that even if Wachovia's commissions, fees, and margin interest payments come within Section 546(e), this Court should find an exception to the stockbroker defense because applying it in the context of an alleged Ponzi scheme would allow "a broker to retain ill-gotten profits" and undermine the "equitable goals of the Bankruptcy Code." Appellant's Br. at 51.

Although Section 546(e) does not include a Ponzi scheme exception on its face, it does provide several express exceptions to the application of the defense, including claims brought under 11 U.S.C. § 548(a)(1)—"fraudulent transfers" made "with actual intent to hinder, delay, or defraud . . . ." And in *Manhattan Investment*, for example, the court held that the existence of a Ponzi scheme gave rise to a presumption of actual fraud on the part of the broker, triggering the fraud exception to the stockbroker defense. *See* 397 B.R. at 14 n.18 (permitting the bankruptcy estate to recover commissions in the context of a Ponzi scheme because "§ 546(e) does not preclude avoidance if there is actual fraud under § 548(a)(1)(A)").

Here, the bankruptcy court did not reach the issue of whether Grayson established a claim under Section 548(a)(1)(A) to Wachovia's commissions, margin interest payments, and fees. Specifically, in its summary judgment order, the bankruptcy court denied Wachovia's motion with regard to this claim, finding it was "not ripe for determination." *In re Derivium Capital, LLC*, 437 B.R. at 813. Then the bankruptcy court specifically excepted and reserved the issue from the evidentiary hearing on the reasonableness and customariness of Wachovia's commissions, stating "Plaintiff will have the opportunity during the second part of the trial to present evidence regarding the circumstances under which the Defendants obtained the commissions for the purpose of establishing its § 548(a)(1) claim." J.A. 804. Subsequently, the parties settled certain claims, and it appears the later hearing was not held. Because the district court simply affirmed the bankruptcy court's order, whether Grayson can recover commissions, fees, and margin interest payments under Section 548(a)(1)—upon establishing actual fraud by Wachovia—remains unanswered. And Grayson fails to convince us we need to establish an extra-statutory fraud exception to the stockbroker defense.

V.

Finally, Grayson contends that the district court and the bankruptcy court erred in dismissing its tort claims under the doctrine of *in pari delicto*. *In pari delicto* is an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing. *See e.g.*, *In re Bogdan*, 414 F.3d at 514 (describing *in pari delicto* as "an affirmative defense that bars a wrongdoer from recovering against his alleged coconspirators"). That is, Grayson cannot recover damages if it bears equal or greater fault in the alleged tortious conduct as the alleged tortfeasor.

As assignee of the trustee, Grayson represents the bankruptcy estate. The bankruptcy estate, as defined by Section

541, includes "all legal or equitable interests of the debtor in property as of the commencement" of bankruptcy. 11 U.S.C. § 541(a)(1). "These legal and equitable interests include causes of action." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir. 2001) (citing, among other things, 3 COLLIER ON BANKRUPTCY ¶ 323.02[1]). Under Section 541, therefore, a trustee "stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. Conversely, the trustee is, of course, *subject to the same defenses* as could have been asserted" against the debtor. *Id.* (quotation marks and brackets omitted) (emphasis added). In other words, to the extent that *in pari delicto* would have barred a debtor from bringing suit directly, it similarly bars a bankruptcy trustee—standing in the debtor's shoes—from bringing suit. *See, e.g.*, *R.F. Lafferty*, 267 F.3d at 358; (joining the Second, Sixth, and Tenth Circuits in the application of the defense); *Sender v. Buchanan* (*In re: Hedged-Invs. Assocs., Inc.*), 84 F.3d 1281, 1285 (10th Cir. 1996) (applying *in pari delicto* to bar a trustee's claims against third-party investors who profited from debtor's Ponzi scheme).

As Grayson notes, the Seventh and the Ninth Circuits have declined to apply the *in pari delicto* doctrine in bankruptcy cases. *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995); *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995). But, crucially, those cases involved receivers who, unlike trustees, are not subject to Section 541. We recognize the appeal of those cases' reasonings—i.e., that the appointment of an innocent receiver removed the wrongdoer and changed the equities, rendering the application of the punishing *in pari delicto* doctrine unwarranted. Nevertheless, that reasoning does not comport with the plain language of Section 541. *Sender*, 84 F.3d at 1285 (stating that Section 541 "establishes the estate's rights as no stronger than they were when actually held by the debtor. Congress intended the trustee to stand in the shoes of the debtor and 'take no greater rights than the debtor himself had.' Therefore, to the extent [that the trustee] must rely on

11 U.S.C. § 541 for his standing in this case, he may not use his status as trustee to insulate the [debtor] from . . . wrongdoing . . . .") (internal citations omitted).

Accordingly, we agree with the district court and bankruptcy court that Grayson's status as the trustee's assignee does not afford it protection from the application of *in pari delicto*. And because Grayson's complaint alleged that Derivium engaged in the alleged torts, Grayson, standing in Derivium's shoes, is barred from suing Wachovia for those torts.

In the alternative, Grayson contends that the "adverse interest" exception to *in pari delicto* applies here. Under the "adverse interest" exception, the wrongs of an agent are not imputed to the principal if the agent acted adverse to the principal's interests. *See Little v. S. Cotton Oil Co.*, 153 S.E. 462, 463 (S.C. 1930) ("[W]hen an agent is engaged in a transaction in which he is interested adversely to his principal, the principal will not be charged with knowledge of the agent acquired therein."). Specifically, Grayson contends that because Derivium's owners engaged in the alleged misconduct and their misdeeds were adverse to Derivium, their conduct should not be imputed to it.[9]

The bankruptcy court rejected Grayson's adverse interest argument on the basis of the "sole actor rule." That rule provides that an agent's conduct is imputed to the principal if that agent is the principal's sole representative. *See, e.g.*, *R.F. Laf-*

---

[9]In support of its argument, Grayson cites to another case involving Derivium, *In re Derivium Capital, LLC*, 380 B.R. 407 (Bankr. D.S.C. 2006), in which the court declined to apply *in pari delicto* to claims against Derivium insiders who allegedly acted adversely to Derivium's interest. The bankruptcy court appropriately distinguished that case from this one, underscoring that those claims were against a Derivium insider, whereas here, the claims are against a third party. *In re Derivium Capital, LLC*, C/A No. 5-15042-JW, Adv. Pro. No. 07-80119-JW at 5–6 (June 10, 2008).

*ferty*, 267 F.3d at 359 ("The general principle of the 'sole actor' exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests."); 9 NORTON BANKR. L. & PRAC. 3d § 174:36 ("The adverse interest exception . . . is usually qualified or limited by the 'sole actor rule.' Under this rule, . . . where a 'sole actor' clearly dominates the principal, or 'where the principal and agent are one and the same,' the acts and knowledge of the agent will nonetheless be imputed to the principal . . . even if the agent is acting adverse to the principal.").

Although it does not appear as if the South Carolina Supreme Court has addressed the relationship between the sole actor rule and the adverse interest exception, as the bankruptcy court explained, the sole actor rule is a well-established principle of agency law. *In re Derivium Capital, LLC*, C/A No. 5-15042-JW, Adv. Pro. No. 07-80119-JW at 7 (June 10, 2008) (citing *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222 (1923) (charging a company with the knowledge of its agent "because he was the sole actor for the company" engaged in the misconduct)); *see also Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 838 (8th Cir. 2005); *Mediators, Inc. v. Manney* (*In re Mediators, Inc.*), 105 F.3d 822, 827 (2d Cir. 1997); *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir. 1955). The rationale underpinning this rule is that "the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability." *R.F. Lafferty*, 267 F.3d at 359.

Here, Grayson's complaint alleged that Derivium's owners completely controlled Derivium and operated the 90% Stock-Loan Program. Specifically, the complaint alleged that "all of [the] entities and all of [the] accounts were controlled by Derivium's Owners," and that, regarding the 90% Stock-Loan

Program, all of the "representations crafted and disseminated by the Derivium Owners were gross lies" because "Derivium['s] Owners simply took the stock that they received as collateral and sold it." J.A. 369; 380. Therefore, even under the facts as Grayson alleged them, the Derivium owners were "sole actors."

Accordingly, their actions can be imputed to Derivium. The district court therefore did not err in affirming the bankruptcy court's ruling that *in pari delicto* bars Grayson's tort claims against Wachovia.

## VI.

For the reasons stated above, we affirm the judgment of the district court.

*AFFIRMED*