**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———

**No. 21-1536**

———

In re:  INFINITY BUSINESS GROUP, INCORPORATED,

       Debtor.

------------------------------

ROBERT F. ANDERSON, as Chapter 7 Trustee for Infinity Business Group, Inc.,

       Trustee - Appellant,

   v.

MORGAN KEEGAN & COMPANY, INC.; KEITH E. MEYERS,

       Defendants - Appellees.

———

Appeal from the United States District Court for the District of South Carolina, at Columbia. J. Michelle Childs, District Judge. (3:19-cv-03096-JMC)

———

Argued:  March 9, 2022                         Decided:  April 19, 2022

———

Before RICHARDSON and HEYTENS, Circuit Judges, and KEENAN, Senior Circuit Judge.

———

Affirmed by published opinion. Judge Heytens wrote the opinion, in which Judge Richardson and Senior Judge Keenan joined.

———

**ARGUED:** Robert W. Humphrey, II, WILLOUGHBY & HOEFER, P.A., Charleston, South Carolina, for Appellant. Valerie S. Sanders, EVERSHEDS SUTHERLAND (US)

LLP, Atlanta, Georgia, for Appellees. **ON BRIEF:** Mitchell Willoughby, Elizabeth Zeck, WILLOUGHBY & HOEFER, P.A., Columbia, South Carolina; Gerald Malloy, MALLOY LAW FIRM, Hartsville, South Carolina, for Appellant. Robert C. Byrd, A. Smith Podris, PARKER POE ADAMS & BERNSTEIN LLP, Charleston, South Carolina; Olga Greenberg, EVERSHEDS SUTHERLAND (US) LLP, Atlanta, Georgia, for Appellees.

_____

TOBY HEYTENS, Circuit Judge:

Infinity Business Group used a dodgy accounting practice that artificially inflated its accounts receivable and therefore its revenues. The company's CEO cooked up the practice, and the board of directors and outside auditors blessed it. Many of these wrongdoers have already been held responsible for their conduct through civil lawsuits, criminal charges, or both.

Yet Infinity's bankruptcy trustee remains unsatisfied. He insists the true mastermind was a financial services company Infinity contracted with to (unsuccessfully) solicit investments. But even assuming—contrary to the bankruptcy court's scrupulous factfinding—that the financial services company played *some* role in creating or perpetuating the flawed accounting technique, the trustee still cannot succeed in holding the financial services company liable. As both the bankruptcy and district courts correctly held, the trustee's claims run headlong into the longstanding principle that one wrongdoer cannot recover from another for joint wrongdoing. We thus affirm.

I.

A.

Infinity was in the business of pursuing collections on bad checks, such as those that initially bounce for insufficient funds. The company was governed by a board of directors and managed by a handful of corporate officers. Infinity's CEO, Byron Sturgill, also acted as the chief financial officer from the company's inception in 2003 until September 2006. Sturgill was in the habit of claiming he was a certified public accountant, but that was a lie. In fact, Sturgill failed every part of the exam six times.

3

As a young business, Infinity required regular infusions of capital. For help in raising that capital—and potentially plotting an initial public offering—Infinity turned to Morgan Keegan & Company, Inc., and Keith Meyers, one of Morgan Keegan's investment advisers who "focused his work on raising institutional capital" for clients. JA 227. Meyers was a relatively recent business school graduate who had briefly worked as an accountant auditing manufacturing businesses before pursuing his MBA. By the time Infinity retained Morgan Keegan in 2006, however, Meyers' accounting license had been expired for about five years.

Infinity engaged Morgan Keegan for the limited purpose of assisting with "a private placement of" Infinity stock. JA 1245. The engagement contract required Infinity to "furnish Morgan Keegan with such information . . . including financial statements . . . as Morgan Keegan may reasonably request" and provided that Morgan Keegan could "rely upon the accuracy and completeness of the [furnished information] without independent verification." JA 1246. Infinity remained "solely responsible for the contents of" all "written or oral communications to any actual or prospective" investor. JA 1246.

Morgan Keegan's first major task was helping prepare a confidential information memorandum for potential investors, which was to include Infinity's financial information from 2003 to 2005. Sturgill (Infinity's CEO) prepared and provided the relevant information for all three years.

The 2005 financials reflected a one-year increase in accounts receivable of more than $9 million—from approximately $150,000 to $9.9 million. Meyers questioned the increase on behalf of Morgan Keegan, and Sturgill offered multiple explanations, including

4

a change in reporting practices and an uptick in a new area of business. Sturgill also explained that, starting in 2005, the numbers now reflected anticipated receivables, including fees Infinity *would be* entitled to *if* it managed to collect a check, with a certain portion discounted for estimated non-collections.

Everyone now agrees this accounting practice was inconsistent with the generally accepted accounting principles endorsed by the Securities and Exchange Commission. At the time, though, Sturgill "was adamant" that the technique complied with those principles, JA 233, and Infinity's external auditors repeatedly corroborated that position. Meyers—whose limited accounting experience had been in a different sector nearly a decade before—trusted those representations.

Morgan Keegan incorporated the 2005 financial statements Sturgill provided into the memo it prepared for potential investors. The memo's first page stated that it was based on "information furnished" by Infinity and reminded prospective buyers of their "responsibility to perform a thorough due diligence review prior to consummating a transaction." JA 1282.

Bison Capital, a potential investor that received Morgan Keegan's memo, was interested and began due diligence. Because the accounts receivable figure purported to exclude "checks the company feels are not collectable," JA 1335, Bison asked for data about Infinity's historical success rate. A Morgan Keegan employee, Calvin Clark, helped Infinity prepare its responses. In calculating the historical success rate, Clark excluded any checks "older than 60 days," JA 1508, and later described "his methodology" to both Infinity management and "Bison's representative," JA 238. Bison's contemporaneous

5

writeup reflected its understanding that "[t]he sample of 400 checks is small relative to the entire portfolio of checks" and therefore that "no inferences can be considered as genuinely accurate until a larger sample, or ideally the entire population of check data is analyzed." JA 1956.

Bison's diligence review also included a background check on key members of Infinity's management team, which proved the dealbreaker. After learning that Infinity's CEO (Sturgill) had been misrepresenting his experience and credentials, Bison turned tail and the deal collapsed. Another potential investor—Eastside Partners—also bailed after learning of Sturgill's unfavorable background check.

Morgan Keegan attracted no other serious attention from institutional investors under the 2006 engagement, but it did help Infinity and outside counsel adapt material from the memo Morgan Keegan prepared for other purposes, including an application for a line of credit with Regions Bank and other securities offerings to individual investors. During this period, Infinity also worked with its auditors to redo its 2003 and 2004 financial statements, including extending the same dubious accounting technique to the 2004 financial statements, which Infinity's external auditors again approved. Nothing suggests Morgan Keegan played any significant role in the reworking of the older financials or that it generated any significant new material in connection with those other projects. Rather, Morgan Keegan's involvement was largely limited to adapting the material from its earlier memo and providing relatively minimal line edits on documents prepared by others.

After the Bison and Eastside deals fell through, Meyers decided to terminate Morgan Keegan's relationship with Infinity on October 31, 2006. Meyers participated in

6

an "exit interview" with Infinity management, where he provided recommendations for improving the company's prospects. JA 247. Meyers offered three main pieces of advice: (1) Infinity's leadership should share their background reports with one another; (2) Infinity should hire a "bigger" and "more credible" accounting firm "that understands" the debt-collection "space" to conduct its external audits; and (3) Infinity should abandon its existing accounting policy for receivables and adopt more "conservative accounting," writing off the current receivables so Infinity "won't have to continue to explain the accounting." JA 247, 946–47.

Meyers was not the only one questioning the propriety of Infinity's accounting practices at the time. Ernst & Young also cast doubt on the policy in an email to Infinity's CEO and outside securities counsel (but not to Meyers or anyone else at Morgan Keegan).

Things came to a head at Infinity's January 2007 board meeting, where the board discussed whether to stick with "the way the revenues of the company are booked, i.e., checks in the system waiting for collection." JA 2849. The minutes reflect the board's unanimous judgment that it was in the company's "best interests to maintain the status quo and not to change the reporting method." JA 2849.

"There is no evidence that Morgan Keegan, Meyers or Clark attended or participated in" the January 2007 board meeting. JA 250. In fact, Morgan Keegan "had little involvement with [Infinity] in 2007 beyond occasional phone calls and emails checking in." JA 252. Meyers also occasionally spoke with potential individual investors (including colleagues at Morgan Keegan) and personally invested $50,000 in Infinity.

7

In December 2007, Infinity asked Meyers whether he knew of any new potential investors and sent Meyers some updated financial information. Meyers was surprised to learn that the accounts receivable had not been written off as he had recommended. When Meyers asked about it, Infinity's president responded, "[i]n an apparent misrepresentation," that Infinity was planning to write off the balance at the end of 2007. JA 255–56.

Infinity formally engaged Morgan Keegan a second time in April 2008 to attempt to obtain "mezzanine debt"—debt that is not fully secured but comes with perks (such as stock or other equity) to make it more attractive to lenders. Unlike the 2006 contract, the 2008 agreement also stated Morgan Keegan would "provide financial advisory services, including general business and financial analysis" such as "due diligence" of "financial results and management projections." JA 3131. Once again, Morgan Keegan's compensation hinged on successfully closing a transaction.

By then, Infinity was (finally) considering "moving to a more conservative accounting policy" and writing off the inflated receivables balance, JA 260 (quotation marks and alterations omitted), which Meyers advised Infinity to disclose to any potential financing partners. Meyers identified two potential lenders, but one dropped out almost immediately after learning of the potential write-off. The other interested investor was the Morgan Keegan Strategic Fund, a private equity firm that was affiliated with (but separate from) the advising group that employed Meyers. The Strategic Fund engaged a firm called Transaction Services to conduct due diligence on Infinity.

8

Transaction Services determined that Infinity's accounting technique was not compliant with generally accepted accounting principles, and its report was the first-in-time document in this record saying so. The report went to Meyers and certain management officials at Infinity, which is how Meyers learned that the policy was not compliant. Meyers continued to push Infinity to change its policy, but management officials—including Sturgill—refused, apparently not wanting to explain any change to existing shareholders.

Even after receiving the Transaction Services report, the Strategic Fund planned to extend Infinity mezzanine debt and prepared a term sheet. Infinity rejected the deal, finding the Strategic Fund's terms too onerous, particularly the amount of stock the Strategic Fund would be left with even after Infinity paid off the debt. The deal fell apart, meaning Morgan Keegan once again went uncompensated. Other than providing a "general overview" of Infinity's services at a sales conference in 2008, JA 270, and having a brief conversation with an interested investor in December 2008, that was the end of Morgan Keegan and Meyers' involvement with Infinity.

B.

Infinity limped on for another two years, but ultimately could not raise enough capital to continue operations. In 2010, after shareholders had removed several key management figures, Infinity initiated proceedings under Chapter 7 of the Bankruptcy Code, "in which the debtor's assets are immediately liquidated and the proceeds distributed to creditors." *Harris v. Viegelahn*, 575 U.S. 510, 512 (2015). The bankruptcy court appointed a trustee to represent Infinity's estate. Infinity's chief financial officer and auditor pleaded guilty to federal criminal charges stemming from their work with Infinity,

9

and South Carolina's attorney general pursued civil enforcement proceedings against Infinity's top management.

The trustee filed this adversary proceeding as part of the bankruptcy case, seeking to recover against several of Infinity's management officials, its external auditor, Morgan Keegan, and Meyers. The management and auditor defendants all defaulted, confessed judgment, or settled; by trial, only Morgan Keegan and Meyers remained. Arguing that the accounting technique was the overriding cause of Infinity's downfall and that Morgan Keegan and Meyers were primarily to blame, the trustee pursued four theories of recovery: common law fraud and breach of fiduciary duty under South Carolina law (where Infinity's operations center was located); aiding and abetting breach of fiduciary duty under Nevada law (where Infinity was incorporated); and federal securities fraud (which the trustee has not pursued here).

After an 18-day bench trial, the bankruptcy court entered judgment in favor of Morgan Keegan and Meyers. The court found the trustee failed to prove the essential elements of any of his claims. It also concluded all of the trustee's claims were barred by an affirmative defense known as *in pari delicto*, which bars recovery by a plaintiff who "bears equal or greater fault in the alleged tortious conduct" than the defendant. JA 292. Rejecting the trustee's efforts "to frame [Infinity] as a neophyte to the world of securities and raising capital that relied heavily on Meyers and Morgan Keegan for advice," the court found Infinity, "through its management, bears the greater fault in this matter for the implementation and consequences of the use of the" faulty accounting technique. JA 328.

10

The trustee appealed to the district court, which agreed with the bankruptcy court's conclusions on both the elements of the claims and *in pari delicto* and therefore affirmed. Like the district court, we review legal issues de novo and the bankruptcy court's factual findings for clear error. *Grayson Consulting, Inc. v. Wachovia Secs., LLC*, 716 F.3d 355, 360 (4th Cir. 2013).

## II.

The doctrine of *in pari delicto*—Latin for "in equal fault"—embodies the equitable principle "that where parties are . . . equally in the wrong, no affirmative relief will be given to one against the other." *Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 892–93 (S.C. 2015) (quotation marks omitted). This intuitive principle operates as an affirmative defense in many actions, precluding a plaintiff who "bears equal or greater fault" from recovering. *Grayson Consulting*, 716 F.3d at 367.

On appeal, the trustee no longer challenges the bankruptcy court's factual finding that—even assuming Morgan Keegan played a role in developing or implementing the accounting policy and that the policy caused all of Infinity's troubles—Infinity (through its management) nonetheless bears greater fault than Morgan Keegan or Meyers. Instead, the trustee asserts four ostensible legal barriers to applying *in pari delicto* here. Seeing no such obstacle, we hold that the bankruptcy court properly applied *in pari delicto* to bar all the trustee's claims.

11

A.

The trustee first contends that he represents not just Infinity but also Infinity's creditors. And when acting on behalf of the presumptively blameless creditors, the trustee insists, he is immune from *in pari delicto*.

We do not approach this issue on a blank slate. This Court has recognized that a trustee generally acts as "the representative of the estate," 11 U.S.C. § 323(a), and therefore "can . . . assert those causes of action possessed by the debtor" as part of the power to secure the "estate" under 11 U.S.C. § 541(a). *Grayson Consulting*, 716 F.3d at 367 (quotation marks omitted). When exercising such powers, however, a trustee "stands in the shoes of the debtor" and is "subject to the same defenses as could have been asserted against the debtor." *Id.* (quotation marks and emphasis omitted). We have specifically held that this includes *in pari delicto*, stating: "[T]o the extent that *in pari delicto* would have barred a debtor from bringing suit directly, it similarly bars a bankruptcy trustee—standing in the debtor's shoes—from bringing suit." *Id.* For that reason, the trustee is plainly subject to *in pari delicto* to the extent he brings this action under Section 541.

As the trustee correctly notes, however, the Bankruptcy Code grants trustees certain powers beyond those of the debtor, including the ability "to, in essence, step into [a] *creditor's* shoes to do the same thing [that] creditor could do." *Cook v. United States*, 27 F.4th 960, 965 (4th Cir. 2022) (quotation marks omitted) (emphasis added). As relevant here, 11 U.S.C. § 544(a)(1) grants a trustee the powers of a hypothetical judgment lien creditor—that is, if a creditor holding a judgment lien against the debtor could pursue a particular action on the debtor's behalf, the trustee may do so too even if no actual creditor

12

holds such a lien. See *Angeles Real Estate Co. v. Kerxton*, 737 F.2d 416, 418 (4th Cir. 1984). The trustee's argument that he may evade *in pari delicto* by proceeding instead under Section 544(a)(1) therefore raises two questions: (1) would a judgment lien creditor be able to bring the debtor's causes of action under "applicable state law," *Angeles Real Estate*, 737 F.2d at 418; and (2) if so, would that (again, hypothetical) creditor be subject to *in pari delicto*?

The trustee largely skips over the first question, simply assuming a judgment lien creditor would be able to pursue each of his causes of action. We are less certain. True, the trustee cites a bankruptcy court decision stating that, "[u]nder Colorado law, judgment lien creditors have the right to pursue all claims available to a debtor corporation before bankruptcy was declared." *Sender v. Porter*, 231 B.R. 786, 793 (D. Colo. 1999). But no one asserts that the underlying claims here are governed by Colorado law, and the trustee identifies nothing in the laws of South Carolina or Nevada—the States under whose laws the trustee has asserted claims, see *supra* at 10—bestowing such expansive rights on judgment lien creditors. Cf. *Reynolds v. Tufenkjian*, 461 P.3d 147, 148 (Nev. 2020) (Nevada law grants judgment creditors the power to pursue only "those claims that the judgment debtor has the power to assign").

Even assuming such rights exist, moreover, the logic of *Grayson Consulting* explains why *in pari delicto* would be available as a defense in such an action. In *Grayson Consulting*, we held that a trustee proceeding under 11 U.S.C. § 541 is subject to the same defenses as the debtor *because* the trustee stands in the debtor's shoes in such an action. 716 F.3d at 367. Under the trustee's Section 544(a)(1) theory here, the underlying shoes

13

would still be the debtor's—just now it would be the (hypothetical) judgment lien creditor standing in the debtor's shoes in the first instance rather than the trustee. For that reason, the creditor would *also* be subject to the same defenses as the debtor. See *id.*; accord *Reynolds*, 461 P.3d at 149 (stating that, as a matter of Nevada law, "a judgment creditor can acquire no greater right in the property levied upon than that which the judgment debtor possesses" (quotation marks omitted)); *Howard v. Allen*, 176 S.E.2d 127, 130 (S.C. 1970) (same principle in South Carolina). So, at the risk of wearing through the metaphor entirely, when a bankruptcy trustee steps into the shoes of a hypothetical creditor who would herself stand in the shoes of the debtor in bringing a given action, the trustee is still subject to the same defenses as the debtor, including *in pari delicto.*[1]

The trustee's complaint also purports to base this action on his power to avoid unlawful preferences under 11 U.S.C. § 547 and fraudulent transfers under Sections 548 and 550. But the trustee has not explained how Morgan Keegan and Meyers—who never received any compensation from Infinity—could have received such a preference or a transfer. Nor has the trustee actually invoked those sections on appeal because his brief clearly states that his claims are brought only under "§ 541 and § 544." Trustee Br. 72. We therefore do not consider whether a trustee pursuing an avoidance action under Sections 547, 548, or 550 would be subject to an affirmative defense such as *in pari delicto*. Cf. *McNamara v. PFS*, 334 F.3d 239, 246 (3d Cir. 2003) (holding *in pari delicto* does not apply

---

[1] This conclusion does not run afoul of 11 U.S.C. § 544(a)'s prohibition on considering "any knowledge of the trustee or of any creditor" because *in pari delicto* has nothing to do with the knowledge of those actors. At most, the defense implicates the knowledge (and deeds) of the *debtor*, which Section 544 says nothing about.

14

to a trustee acting under Section 548); *Podell & Podell v. Feldman*, 592 F.2d 103, 110–11 (2d Cir. 1979) (similar for trustee pursuing avoidance action under earlier version of the Bankruptcy Code). We hold only that when a trustee pursues a right of action that ultimately derives from the debtor—even if the trustee is nominally exercising a creditor's powers when doing so—the trustee remains subject to the same defenses as the debtor.

## B.

The trustee next contends that agency law principles preclude "those who collude with corporate insiders" from asserting an *in pari delicto* defense. Trustee Br. 64. But even assuming (without deciding) that this argument accurately states Nevada or South Carolina law, it founders on factual grounds.

The bankruptcy court found that Morgan Keegan and Meyers did not engage in collusion—or even have *knowledge* of wrongdoing—about Infinity's accounting practices, and that finding was not clearly erroneous. No undisputed testimony or document in the record establishes that Morgan Keegan or Meyers understood that the accounting technique was illegitimate (as opposed to merely aggressive) until the Transaction Services report informed everyone as much in 2008. The trustee asks us to draw a contrary conclusion based on an inferential chain of reasoning—essentially positing that Meyers *must* have recognized the problem given his accounting background. But the bankruptcy court reasonably declined to draw that inference, deeming it "speculative." JA 319. Instead, the court credited Meyers' testimony that "he relied on the repeated assurances of" Infinity's CEO and auditor "that the [a]ccounting [p]ractice was proper" and that Meyers' limited accounting experience in an altogether different sector (manufacturing) did not clue him

15

into the problems. JA 321–22. "Weighing the competing evidence presented by the parties and arriving at a conclusion is exactly the task that the bankruptcy court must carry out as fact-finder," and we see nothing requiring us to set aside that court's "very detailed and exhaustive factual analysis" here. *Bate Land Co. LP v. Bate Land & Timber LLC*, 877 F.3d 188, 198 (4th Cir. 2017).

C.

The trustee also argues that the actions of Infinity's management officers cannot be imputed to Infinity (and therefore to the trustee) because the relevant officers were acting adversely to Infinity's interests. Here, too, we are unpersuaded.

Despite agreeing that some adverse interest exception to *in pari delicto* exists, the parties debate just how adverse the officers' actions must be to trigger it. The trustee does not dispute that Nevada, apparently in line with most jurisdictions, requires "that the agent's actions must be completely and totally adverse to the corporation to invoke the exception"—not merely misguided but akin to "outright theft or looting or embezzlement." *Glenbrook Capital Ltd. P'ship v. Dodds*, 252 P.3d 681, 695 (Nev. 2011) (quotation marks omitted); see JA 298 n.50 (collecting cases in other jurisdictions). But the trustee insists South Carolina would adopt a less stringent approach, citing an intermediate appellate decision stating that "the 'adverse interest' exception applies where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests." *Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 547 (S.C. Ct. App. 2006).

We are hard-pressed to see much daylight between actions that are "totally adverse" to a principal and those that are "clearly adverse." But even assuming that some delta exists

16

*and* that South Carolina follows the less stringent standard, the trustee still cannot prevail because this simply is not a close case. Indeed, the bankruptcy court identified all sorts of benefits Infinity derived from the accounting technique at issue, including growing the business's base, raising capital, paying other debt, and extending the company's life before liquidation. See JA 300–15. In essence, the trustee insists that the adverse-interest exception applies any time misfeasance might eventually result in significant liability to the principal. But that is true of all kinds of tortious conduct, so adopting the trustee's proposed approach to the adverse-interest exception would virtually swallow the *in pari delicto* rule. We see no basis to conclude that Nevada or South Carolina would adopt such a capacious interpretation of adversity.

D.

Finally, the trustee contends that *in pari delicto* is categorically inapplicable in cases involving fiduciary duties.[2] In making this argument, the trustee asserts that Nevada and South Carolina would follow the Delaware Court of Chancery, which has held that *in pari delicto* "has no force in a suit by a corporation against its own fiduciaries" or against "claims against defendants like auditors" who participate in "aiding and abetting breaches of fiduciary duty." *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 304, 319 (Del. Ch. 2015). Otherwise, the Delaware court feared, "faithless directors and officers" could attribute their *own* bad acts back to the corporation itself, making it difficult for

---

[2] This argument also presumes—contrary to the bankruptcy court's analysis—that Morgan Keegan and Meyers either had a fiduciary duty to Infinity or abetted a breach of duty by someone else who did. Because we hold that *in pari delicto* applies whether or not that is true, we do not consider those issues.

17

"parties like receivers, trustees, and stockholder derivative plaintiffs" to hold such directors and officers accountable. *Id.* at 304.

Regardless of the merits of such a rule, the trustee can mount no plausible argument that Nevada has adopted it. To the contrary, the Supreme Court of Nevada has squarely held that *in pari delicto* "applies to corporations and shareholder derivative suits" in an aiding-and-abetting breach of fiduciary duty case. *Glenbrook Capital*, 252 P.3d at 694–97. The court specifically sought to incentivize companies "to carefully select and monitor those who are acting on the corporation's behalf," *id.* at 695—a goal that would not be furthered by adopting the blanket exception discussed in *Stewart*. And the Nevada court accounted for the policy concerns expressed in *Stewart* by adopting a multifactor test that neutralizes *in pari delicto* in specific cases when, among other things, "the public cannot be protected" or the defendant would "be unjustly enriched." *Id.* at 696 (quotation marks omitted).

The case law is somewhat less developed in South Carolina. But the State's only appellate decision implicating this issue held that *in pari delicto* barred a breach of fiduciary duty claim in a case whose facts resemble those found here—a corporation's receiver sued a bank that had enabled the corporation's fraud but did not mastermind or benefit from it. See *Myatt*, 635 S.E.2d at 546–47. And, in that case, the South Carolina court held that *in pari delicto* barred the claims without airing any of the policy concerns discussed in *Stewart*. *Id.* at 546–48.

The trustee urges us to treat *Myatt* as a drive-by holding and impute the Delaware trial court's reasoning in *Stewart* to South Carolina. We decline the invitation. *In pari*

18

*delicto* is well-established in South Carolina, see *Proctor*, 778 S.E.2d at 892–93, and *Myatt* is, at minimum, a strong signal that South Carolina has little concern about applying the defense in situations where defendants do not seek to impute their own wrongful actions to the corporation, 635 S.E.2d at 546–47. That is precisely the case here. Morgan Keegan and Meyers are not seeking to avoid liability by pointing to their *own* wrongful conduct and asserting it should be attributed to Infinity. Instead, they are arguing that the wrongful conduct of Infinity's own officers and directors exceeds any of theirs and thus bars recovery. We see no indication that South Carolina would prohibit application of *in pari delicto* in such circumstances.

*     *     *

As the bankruptcy court found, Infinity's officers and auditors were the authors of the company's demise—not Morgan Keegan or Meyers. At worst, the latter simply failed to stop a ship that was already sinking, and the law does not hold them responsible for that failure. The judgment in favor of Morgan Keegan and Meyers is therefore

*AFFIRMED*.

19